[No. B192825. Second Dist., Div. Six. June 19, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE LYNN SONS, Defendant and Appellant.

**COUNSEL**

Sullivan & Cromwell, Robert A. Sacks and Michael H. Steinberg for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Margaret E. Maxwell and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**YEGAN, Acting P. J.**—This opinion hopefully brings an end to the continuing legal saga of the People of the State of California versus Bruce Lynn Sons. Appellant was originally charged with special circumstances first degree murder in Kern County for having killed California Highway Patrolman Richard Maxwell. A jury convicted him of special circumstances first degree murder but spared his life. He was sentenced to life imprisonment without the possibility of parole. The judgment was affirmed by the Court of Appeal, Fifth Appellate District. (*People v. Sons* (Mar. 3, 1999, F023776) [nonpub. opn.].)

By stipulation, this conviction was vacated in United States District Court because the former prosecutor intentionally withheld discovery concerning

Officer Maxwell's previous disciplinary record. (See *Brady v. Maryland* (1963) 373 U.S. 83, 86 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194]; see also *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 378 [285 Cal.Rptr. 231, 815 P.2d 304].) The Attorney General conceded that appellant's constitutional right to a fair trial had not been afforded to him by reason of the prosecutor's withholding of discovery.[1] The matter was returned to the state trial court.

Appellant filed a motion to bar retrial on a jeopardy theory. The motion was denied. He then petitioned for relief in the Court of Appeal, Fifth District, which concluded that retrial was not barred. (See *Sons v. Superior Court* (2004) 125 Cal.App.4th 110 [22 Cal.Rptr.3d 647].) The California Supreme Court unanimously denied review and the matter was twice retried in Kern County with both juries unable to arrive at a unanimous verdict.

By reason of extensive press coverage, a change of venue was granted and the matter was tried in Santa Barbara County. The jury acquitted appellant of murder but found him guilty of voluntary manslaughter with use of a firearm.[2] Because he had been incarcerated since 1994 and because the punishment for manslaughter with use of a firearm (as of 1994) was less than his custody credits, he was released.

Appellant now contends: "I. The Double Jeopardy Clauses of the United States and the California Constitutions Barred Any Retrial. [¶] . . . [¶] II. The Trial Court Committed Reversible Error by Overruling Judge Kelly's Prior Imposition of Remedial Sanctions. [¶] . . . [¶] III. The Trial Court's Instruction of Appellant's Right to Self-Defense Constituted Reversible Error." As we shall explain, the first contention is resolved against appellant by reason of the doctrine of the "law of the case." The second and third contentions are without merit. We will affirm the judgment.[3]

---

[1] It should be the goal of every prosecutor to fairly try a case and just once. This concept was lost on the former prosecutor's value system. His zeal to obtain a conviction in violation of United States Supreme Court precedent has caused considerable harm to his client, the People of the State of California.

[2] Appellant explains this verdict as follows: "[T]his verdict rested on either a finding of imperfect self-defense or heat of passion."

[3] Sitting as trier of fact, the jury could have found appellant guilty of special circumstances first degree murder with use of a firearm, the lesser offenses, or even acquitted appellant outright. We need not recite the voluminous evidence introduced at the fourth trial. It is unnecessary for the resolution of this appeal. (See *Sons v. Superior Court, supra,* 125 Cal.App.4th 110, 113.) But we do view the evidence in the light most favorable to the judgment which is required by the familiar rules governing appellate review. (E.g., *People v. Cole* (2004) 33 Cal.4th 1158, 1212 [17 Cal.Rptr.3d 532, 95 P.3d 811]; see also *People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) We summarily point this out because were one to consider only the statement of facts in appellant's opening brief, he would be entitled to acquittal as a matter of law. The jury did not credit this "version" of the events.

*Appellant's Animosity Toward the Police*

Prior to the 1994 killing of Officer Maxwell, appellant had demonstrated that he simply did not accept the concept of police power. This animosity toward the police started at least 20 years before the killing. We summarily recite the evidence that leads to this conclusion:

In 1973, two California Highway Patrol (CHP) officers conducted a traffic stop on a car being driven by appellant near his house. Appellant was belligerent, shouted obscenities at the officers and yelled to his boys to retrieve guns from his house. The boys could not find the guns and the officers, showing considerable restraint, simply wrote appellant a traffic citation.

In 1975, appellant threatened to "kick the ass" of CHP Officer Gonzales because he yelled at appellant to slow down when driving on a residential street. When Gonzales identified himself as a peace officer, appellant replied that he was aware of that but that he knew that Gonzales was "off duty."

Later in 1975, CHP Officers Gonzalez and Hankins conducted a traffic stop on a car driven by appellant. Appellant was uncooperative, "seething with rage" and sped away from the detention, colliding with Officer Hankins. They pursued and arrested appellant.

In 1978, CHP Officers Gonzales and Hankins conducted a traffic stop on a car driven by appellant's brother. Appellant was a passenger. Again, he was irate and confronted the officers with clenched fists. He was arrested on outstanding warrants.

In 1988, Kern County Sheriff's Deputies Saunders and Mitchell went to appellant's home to conduct an investigation. Again, appellant was irate, yelled obscenities, and threatened to throw them out of his house.

In 1989, appellant was in the company of Charles Bergeron when a marked police car drove by. Appellant, using his hand as a simulated weapon, announced: "I'd like to shoot them all." Later on in 1989, appellant was again in the company of Bergeron when they pulled in behind a marked police car. Appellant said: "I'd like to ram the son-of-a-bitch."

Even later in 1989, Bakersfield Police Officer Fletcher conducted a traffic stop on a car that appellant was driving at excessive speed. Appellant was again belligerent and said he was not going to sign the ticket. Officer Fletcher explained that if he did not sign the ticket, he would be arrested. Appellant signed the ticket, got into his car, and drove it into Fletcher's police car. He was then arrested and when other officers arrived, appellant apologized for colliding with the police car and was allowed to leave.

In 1993, Kern County Sheriff's Sergeant Reed went to appellant's house to conduct an investigation for damaging a truck. Appellant was very agitated, challenged Reed to a fistfight and shouted obscenities. Reed retreated to discuss the matter with another officer. As they were doing so, appellant sped by in a car showering the officers with dust from the dirt road. The officers pursued appellant and arrested him for damaging the truck.

*Prior Complaints Concerning Officer Maxwell*

At the time he was killed, Officer Maxwell had been employed by the CHP for approximately five years. During this time, there had been nine complaints made against him. After internal investigation by CHP superiors, several of the complaints were sustained. The complaints concerned allegations of excessive force, verbal discourtesy, and profanity. This evidence had a tendency in reason to bolster appellant's theory that Officer Maxwell was overly aggressive and used excessive force in his encounter with appellant. We summarily recite the evidence that leads to this conclusion:

In 1990, Officer Maxwell detained a Mr. Quinonez for speeding. Quinonez had a dog in the vehicle that apparently was behaving aggressively. In an angry manner, Officer Maxwell threatened to shoot the dog if it did not behave. A CHP investigator concluded that Officer Maxwell had been rude and unprofessional during this encounter.

In 1991, Officer Maxwell stopped a Mr. Johnston for speeding. He complained to the CHP, alleging that Maxwell threatened to cite him for "everything in the book." The CHP investigator did not sustain a finding against Maxwell because he did not cite Johnston for all of the offenses he could have.

In 1992, Officer Maxwell stopped Mr. Michael for speeding. He made insulting remarks, e.g., saying he looked like a drug user and that he wore

shoes like those worn by White supremacists. He initially approached the car with his gun drawn, but holstered it prior to talking to Michael. A CHP investigator sustained a finding against Officer Maxwell.

In 1993, Officer Maxwell stopped Mr. McWilliams and when he gave a false name, arrested him for doing so as well as for an outstanding warrant. McWilliams's four-year-old son said that Maxwell used profanity in talking to McWilliams.

In 1993, Officer Maxwell stopped Mr. Parks for speeding. As he approached Parks, he started to draw his service weapon and when asked why he did so, Maxwell responded that this was standard procedure.

In 1993, Officer Maxwell stopped Mr. Norris who was driving a truck. Maxwell told him that he did not have a proper decal on the truck. A verbal argument ensued with Maxwell ordering Norris out of the truck. When Norris walked away, Maxwell drew his service weapon from the holster but did not point it at Norris. After Norris signed the ticket, he was allowed to proceed.

In 1993, Officer Maxwell pursued but was not able to stop a truck. He ultimately located what he thought was the truck at the residence of Mr. Encizo. He confronted Encizo and used profanity telling him and his friends to stay away. He thereafter drove past the Encizo house hoping to see other violations. A CHP investigator sustained a finding against Maxwell. As a result of this incident, a "censurable incident report" was issued and the CHP superior remarked that Maxwell had developed a propensity for the use of profanity and for verbal misconduct that was unprofessional.

In 1994, Officer Maxwell stopped Mr. Kash for a moving violation. He complained to the CHP that Maxwell did not explain the ticket, threatened to arrest him, and threatened to obtain a canine unit to search the car.

In 1994, Officer Maxwell stopped Mr. Smith and warned him that he needed a driver's license. The next month, he stopped Mr. Smith again and he still did not have a driver's license. When Maxwell was distracted by another driver, Smith drove away. He was subsequently arrested. During the arrest, Maxwell seemed angry and used profanity. He wrote Smith a citation and then released him.[4]

---

[4] We have said that these incidents had a tendency in reason to bolster appellant's theory that Officer Maxwell was overly aggressive and used excessive force during his encounter with appellant. We do not retreat from this statement but we note that in not a single prior instance did Officer Maxwell actually use excessive force.

*The Shooting*

On July 10, 1994, Kern County Deputy Sheriff Williams and other officers went to appellant's home to investigate a report of a stolen white El Camino automobile. No one was home at appellant's house and since the car had two different vehicle identification numbers, the officers had the El Camino towed to an impound lot. The next day, appellant and his stepson, Jeremy Sons, located the El Camino and without talking to anyone at the impound lot, retrieved the El Camino. Appellant thereafter called the sheriff's office cursing about his car being stolen by the cops: "The god-damn cops stole my car, and I had to take fucking bolt cutters and cut the lock off the gate to get it back." Appellant then called the sheriff's office again, talked to Deputy Williams, and stated that he owned the car. He was not polite in this conversation, rejected the deputy's suggestion to bring in his paperwork, and asked which officer was out to get him.

On the same day, at the CHP briefing, Officer Maxwell mentioned that he had seen the reported stolen El Camino, it had eluded him, and that he intended to look for it. As Officer Maxwell was on routine patrol in his CHP car, appellant, who was driving the El Camino, accompanied by his stepson, Jeremy, exited an alley in Bakersfield in front of Officer Maxwell, who had to stop suddenly to avoid an accident. Appellant ignored the officer's gesture to pull over and instead drove to his father's house with Officer Maxwell in pursuit. Even though he was on probation for weapons offenses and was not allowed to possess firearms, he had two shotguns and ammunition in the El Camino's passenger compartment.

During the pursuit, Officer Maxwell radioed that he was following the El Camino and it was not yielding to overhead lights. As he pulled into appellant's father's driveway, Officer Maxwell yelled to appellant that he wanted to talk to him. Appellant responded: "Fuck you." Jeremy pushed Officer Maxwell who told him to stay away. Appellant became aggressive, told Maxwell to get off of his property, and told him that he was a "fucking pig." Appellant resisted Officer Maxwell's attempt to arrest and handcuff him. Officer Maxwell unsuccessfully attempted to mace appellant into submission. He repeatedly used his police radio to call for help. Jeremy again used force against Officer Maxwell and he then reported on the radio that two people were resisting arrest.

Jeremy retrieved a shotgun from the El Camino and refused to comply with Maxwell's order to drop the weapon. He finally struck the shotgun with

his police baton. During this confrontation, appellant retreated to a garage, produced a shotgun, and told Jeremy to get to the ground.

A gun battle ensued between Officer Maxwell and appellant. Officer Maxwell fired 12 shots from his .40-caliber service weapon and appellant fired three shots from his shotgun. Appellant was not wounded but Officer Maxwell was mortally wounded. Appellant's first bullet may have grazed Officer Maxwell, the second took his eye out, and the third was a fatal shot to his chest, just above his Kevlar vest. The prosecution expert opined that Officer Maxwell fired the first shots.[5]

Appellant fled on foot but was arrested a short time and distance later. When taken to the police station, appellant stated that he hated the police and that he had been victimized by them his entire life. Thereafter, and while in custody, appellant threatened a custodial officer saying he had "smoked" one officer and he could "smoke" another.

### Double Jeopardy

■ Appellant contends the double jeopardy clauses of the United States and California Constitutions bar any retrial where, as here, the prosecution engages in misconduct to prevent an acquittal. We do not reach the merits of appellant's double jeopardy contention because it has been previously rejected by the Court of Appeal, Fifth Appellate District, in a well-reasoned published opinion. (*Sons v. Superior Court, supra,* 125 Cal.App.4th 110.) We also observe that the California Supreme Court unanimously denied a petition for review. This prior opinion is the "law of the case" and has conclusively decided the issue.

■ The doctrine of the law of the case, as most recently restated by the California Supreme Court, provides: " '[W]here an appellate court states a rule of law necessary to its decision, such rule " 'must be adhered to' " in any " 'subsequent appeal' " in the same case, even where the former decision appears to be " 'erroneous' " ' (*People v. Whitt* (1990) 51 Cal.3d 620, 638 [274 Cal.Rptr. 252, 798 P.2d 849] (*Whitt*), quoting *People v. Shuey* (1975) 13 Cal.3d

---

[5] Assuming Officer Maxwell fired the first shots does not, as a matter of law, show that he used excessive force or that appellant acted in self-defense. In theory, a police officer who is in the course of making an arrest and who is looking down the barrel of a shotgun aimed at him or her need not wait for the first shotgun blast before discharging his or her service weapon. (See *Graham v. Connor* (1989) 490 U.S. 386, 396–397 [104 L.Ed.2d 443, 455–456, 109 S.Ct. 1865].) Our California Supreme Court, in comparable circumstances, has said: "[M]erely pointing the loaded revolver at the officer would have constituted the [felony] offense [of assault with a deadly weapon upon a peace officer] . . . ." (*People v. Bradford* (1976) 17 Cal.3d 8, 20 [130 Cal.Rptr. 129, 549 P.2d 1225].)

835, 841 [120 Cal.Rptr. 83, 533 P.2d 211].) Thus the law-of-the-case doctrine 'prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances.' (*Whitt, supra,* at p. 638.) The doctrine is one of procedure, not jurisdiction, and it will not be applied 'where its application will result in an unjust decision, e.g., where there has been a "manifest misapplication of existing principles resulting in substantial injustice" [citation] . . . .' (*People v. Stanley* (1995) 10 Cal.4th 764, 787 [42 Cal.Rptr.2d 543, 897 P.2d 481] (*Stanley*).)" (*People v. Boyer* (2006) 38 Cal.4th 412, 441 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

Here, there has been no significant change of circumstances, no injustice has occurred which has not been remedied, and no misapplication of existing principles has occurred.[6] Appellant simply seeks to have a subsequent appellate panel disagree with the first appellate panel. We decline this invitation.

*Previous Rulings During the Course of Trial Which Culminate in a Mistrial Are Not Binding on Retrial*

▪ Appellant next contends that the trial court erred when it declined to give a sanction jury instruction crafted for the second and third trials, and when it refused to give an instruction "clarifying" appellant's self-defense claim. These contentions are both premised upon the claim that a subsequent trial court cannot "overrule" a prior trial court. Appellant principally relies on *In re Alberto* (2002) 102 Cal.App.4th 421, 427 [125 Cal.Rptr.2d 526], where the court held that, without a change of circumstances, a subsequent trial court may not "reset" bail set by a prior trial court. Here, however, mistrials were declared in the second and third trials. The effect of a declaration of a mistrial is " 'as if there had been no trial on that issue' [citations]." (*Brown v. Municipal Court* (1978) 84 Cal.App.3d 180, 182–183 [148 Cal.Rptr. 493].) In our view, such declaration has the included effect of vacating previous trial court rulings. Thus, there are no extant rulings to "overrule." (Cf. *People v. Riva* (2003) 112 Cal.App.4th 981, 989–993 [5 Cal.Rptr.3d 649] [trial court ruling excluding defendant's statements was not binding on subsequent trial court after mistrial was declared].)

---

[6] The prosecutor's conduct concerning the officer's disciplinary record was deplorable and condemned by the previous Court of Appeal. (*Sons v. Superior Court, supra,* 125 Cal.App.4th at p. 119.) Appellant claims that there has been a significant change of circumstances because prior to the fourth trial, the new prosecutor discovered and then turned over the original prosecutor's notes, which show that he intentionally withheld discovery. This may be more and damning proof of misconduct but it does not and cannot make the original prosecutor's conduct any more deplorable.

Recently, in *People v. Garcia* (2006) 147 Cal.App.4th 913, 916 [55 Cal.Rptr.3d 12], the Court of Appeal said that a subsequent trial court "was without authority to change a sentence already imposed." We agree with this holding but this case is factually distinguishable and not here controlling. In *Garcia,* the "overruling" was not interrupted by the declaration of a mistrial.

█ The logical import of appellant's contention is that the first trial court's ruling "binds" a subsequent trial court called upon to rule on the same issue. This is akin to saying that the first trial court to rule on a particular issue establishes the "law of the case." This doctrine, however, does not apply to rulings of the trial court. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 896, p. 930; *Provience v. Valley Clerks Trust Fund* (1984) 163 Cal.App.3d 249, 256 [209 Cal.Rptr. 276].)

█ A subsequent trial court is not bound by a prior trial court's rulings on jury instructions. If it were otherwise, the subsequent trial court would be a "ministerial subordinate" of the prior trial court and would have no reason to even confer with counsel or make any rulings on jury instructions. This would be at variance with the trial court's oath and duty to give instructions as it sees the issue, not as a former trial court saw the issue. Trial court judges are required to follow the United States and California Constitutions, California statutory law, the law as declared by the appellate courts of this state (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]) as well as any "law of the case" as declared by the appellate court. But they are not bound by rulings made at trial by a previous trial court judge. Trial court judges are independent judicial officers. They have both the right and the duty, consistent with their oaths of office, to exercise their best judgment, not to abandon it to previous trial court rulings.[7]

## Sanction Instruction

█ Appellant contends that the trial court erred as a matter of law when it declined to give the sanction instruction from the prior trials. This contention is without merit. The decision whether to give a sanction instruction for failure to provide discovery is addressed to the sound discretion of

---

[7] We point out the obvious: Once a designated trial court hears a matter, it should continue to hear it, including retrials, until final judgment is rendered. Presiding and supervising trial court judges could alleviate the potential of conflicting decisions and perceived "overruling" of one trial court decision by another trial court if this course is followed. We realize that there may be instances where this is not possible. For example, (1) a trial court judge may be disqualified after a first trial, (2) a trial court judge may be ill and/or unavailable and time limits may require timely retrial, (3) a change of venue may make it impractical for the first trial court judge to "follow" the case to a faraway county. But, in the vast majority of cases, it would seem prudent that a designated trial court should continue to hear the matter until final judgment is rendered. Avoidance of the potential for conflicting decisions should be a legitimate goal of the judiciary.

the trial court. (*People v. Ayala* (2000) 23 Cal.4th 225, 299 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Lamb* (2006) 136 Cal.App.4th 575, 581 [40 Cal.Rptr.3d 609].) The law concerning the abuse of discretion standard is well known and need not be repeated. (E.g., *Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1448–1449 [77 Cal.Rptr.2d 463], and cases cited therein.) It is sufficient to observe that the decision not to give the instruction here was not arbitrary, whimsical, capricious, or beyond the bounds of reason.

In the second and third trials the jury was instructed as follows: "This trial is necessitated solely because in connection with an earlier trial ten years ago the Prosecution violated Defendant's constitutional rights and committed misconduct by withholding from the Defense information about Officer Maxwell's prior record of improper behavior as a California Highway Patrol officer. You have heard about this evidence at this trial and you will be permitted to assess it in determining the behavior of the parties in connection with the incident that led to Officer Maxwell's shooting death. In that earlier trial, the State sought the death penalty. The death penalty cannot be imposed in this trial.

"In connection with that earlier trial, the former Prosecutor actually knew about these prior incidents of improper conduct by Officer Maxwell and believed them to be important. The former Prosecutor also was required, by virtue of both the Constitutions of the United States and California and California Law, to turn over this information to the Defendant. Nevertheless, the former Prosecutor violated the Defendant's constitutional rights by failing to turn this information over to the defense.

"In reaching your verdict and as part of your deliberations, you may consider the fact that the former Prosecutor believed this prior behavior by Officer Maxwell to be important enough to hide it from the Defendant.

"Also, in connection with the earlier trial, the former Prosecutor lied to the jury in that case by telling the jury that Officer Maxwell had no prior record of improper behavior as a CHP officer when the Prosecutor knew he had such a record. In assessing the evidence that is presented, you may consider the fact that the former prosecutor had lied to the jury in the first trial in his effort to secure a conviction against the Defendant."

Appellant argues that the instant trial court judge was required to give this instruction and that it was "binding" on him because the second and third trial court judge gave it. As previously indicated, there is simply no California authority for this proposition and if this were the law, one trial court would be forever able to bind a subsequent trial court, rendering the court without

power to give the instructions that it thinks are appropriate after hearing the evidence in the subsequent trial.

We do not minimize the misconduct of the former prosecutor. In fact, we believe that where, as here, a prosecutor sets himself or herself above the law as declared by the United States Supreme Court, the prosecutor is subject to adverse employment sanctions, State Bar sanctions, and perhaps civil liability. It is one thing to punish the People's attorney and its office, it is quite another thing to punish its client, the People of the State of California. A trial is a search for the truth and instructions should be given to aid the jury in arriving at the truth. Here, the People's attorney and its office were severely punished when the first conviction was vacated. This "righted" the ship that was torpedoed by the former prosecutor. Or, as indicated by the trial court, "the taint of the first trial has been removed and . . . the playing field has been leveled." If the defense had proffered a less punitive instruction, perhaps the trial court would have given it. But we cannot say, as a matter of law, the sanction instruction given in the second and third trials was required in the fourth trial.

We also observe that the trial court, when impaneling the jury, advised the jury as follows: "This is not a death penalty case. The defendant is charged with shooting Officer Maxwell on July 11th, 1994 while the officer was engaged in the performance of his duties. It is alleged the offense occurred on that date in Bakersfield. A judgment was rendered by a jury. But that judgment was set aside by a stipulation, by agreement, between the defendant and the state because it was agreed that the defendant's rights of fair trial were violated by the original prosecutor . . . . [¶] The violation of the rights that was agreed to was that the prosecutor withheld evidence that was favorable to the defendant and then lied to the jury about that evidence. Now, there have been two further trials in Kern County, in Bakersfield. And then this case [has] been transferred from Kern County to Santa Barbara County because of the great amount of publicity that all of these trials have generated. Both sides want a fair trial."

## Self-defense Instruction

Appellant's third contention, that the trial court erred in rejecting a proposed clarifying instruction on self-defense, is also without merit. Here the trial court properly instructed the jury, consistent with the California Supreme Court precedent of *People v. Curtis* (1969) 70 Cal.2d 347, 357 [74 Cal.Rptr. 713, 450 P.2d 33]. The jury was given CALJIC No. 16.106 which,

inpertinent part provides: "[I]f you find that the peace officer used unreasonable or excessive force in making the arrest or the detention, the person being arrested or detained has no duty to refrain from using reasonable force to defend himself against the use of excessive force."[8] The attorneys on both sides debate the standard instructions on self-defense and engage in a minute dissection of the law of self-defense. But, in the end, it is apparent to an objective reader of this record that appellant's theory of self-defense exactly mirrors the rule of law as stated in *People v. Curtis*. As the theory goes, appellant acted in self-defense and shot Officer Maxwell after Officer Maxwell used excessive force. The jury may have credited this theory to some extent, finding that appellant was acting under an honest but unreasonable belief that he was about to be killed himself. In theory, this would mitigate the charged offense down to voluntary manslaughter. We also observe that the jury could have rejected the claim of self-defense altogether. Instead, it could have found that appellant killed Officer Maxwell in a "heat of passion." (See, *ante*, at p. 93, fn. 2.) Any error in giving, not giving, or not limiting self-defense instructions, which may have been given in the second and third trials, was harmless beyond a reasonable doubt. (E.g., *People v. Williams* (2001) 26 Cal.4th 779, 790 [111 Cal.Rptr.2d 114, 29 P.3d 197].)

Finally, appellant again seizes upon the fact that the previous trial court limited CALJIC No. 16.106 to the special circumstances allegation and contends the instant trial court was obligated to do the same. For the reasons stated earlier (see, *ante*, at pp. 99–100), this contention must fail.

*Conclusion*

Appellant did not initially receive a fair trial. The Fifth District Court of Appeal recognized this but ruled that the remedy was not dismissal. Rather, the remedy was a new trial which would be fair. Appellant has now been given a fair trial and the jury found that he was guilty only of voluntary manslaughter with use of a firearm. We do not second-guess this verdict, which resulted in appellant's release from prison.

---

[8] The jury was also given the following instructions: CALJIC Nos. 5.12, 5.13, 5.14, 5.32, 5.15, 5.17, 5.30, 5.50, 5.51, 5.52, 5.55, 16.102, 16.108, 16.104, 16.105, 16.103, 16.110, 16.111.

Appellant also complains that the prosecutor argued to the jury: "The right of self-defense does not apply to Bruce Sons. He's not entitled to it, because he has a duty to submit to the officer." First, there was no objection or assignment of prosecutorial misconduct to this argument. Second, it must be considered in context. We read this argument to the effect that a person arrested may not utilize self-defense to stop an arrest. We know from other instructions (see text) that the jury was advised that appellant could utilize self-defense against an officer's use of excessive force in making an arrest.

At the sentencing hearing, the trial court remarked "I think he's a changed man. I don't know. But he's been a model prisoner." We hope that the trial court's opinion is correct and that appellant has changed his attitude toward police. If he has not, we pity the unwitting officer who makes the next traffic stop on appellant.

The judgment is affirmed.

Coffee, J., and Perren, J., concurred.

A petition for a rehearing was denied July 9, 2008, and appellant's petition for review by the Supreme Court was denied October 16, 2008, S165519.