[No. B218424. Second Dist., Div. Six. Nov. 23, 2010.]

THE PEOPLE, Plaintiff and Appellant, v.
PETER R. SHRIER et al., Defendants and Respondents.

**COUNSEL**

Edmund G. Brown, Jr., Attorney General, James M. Humes, Chief Deputy Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Mark Geiger, Assistant Attorney General, Susan Melton Bartholomew and David Haxton, Deputy Attorneys General, for Plaintiff and Appellant.

Alexander W. Kirkpatrick for Defendant and Respondent Peter R. Shrier.

Michael D. Nasatir for Defendant and Respondent Arkady Rozenberg.

Vicki I. Podberesky for Defendant and Respondent Ella Rozenberg.

Alan S. Yockelson and Todd L. Melnik for Defendant and Respondent Gersha Gravich.

Kestenbaum, Eisner & Gorin, Dmitry Gorin; and Dennis A. Fischer for Defendant and Respondent Anna Gravich.

## OPINION

**YEGAN, Acting P. J.**—What is the appropriate judicial remedy for interference with the right to counsel by law enforcement agents who intentionally eavesdrop on attorney-client privileged communications? A magistrate ordered outright dismissal of the criminal case. This surely would have a deterrent effect upon law enforcement agents. We balance the competing rights at stake and conclude that dismissal is too drastic and would be "judicial overkill." Exclusion of overheard communications and any derivative evidence flowing therefrom is the appropriate remedy. This should deter overzealous law enforcement agents as there is nothing to be gained by such unlawful activity. At the same time, the Attorney General's client, the People of the State of California, will not be stymied in their attempt to enforce criminal law and recoup public money allegedly "stolen" by respondents.

The People appeal from the superior court's order denying their motion to reinstate a felony complaint pursuant to Penal Code section 871.5.[1] Prior to the preliminary hearing, a magistrate dismissed the complaint concluding that intentional eavesdropping by special agents of the Department of Justice was so outrageous that respondents had been denied due process of law. The eavesdropping occurred while respondents Anna Gravich, Gersha Gravich, and Peter R. Shrier and counsel were reviewing evidence at the Attorney General's office. Respondents Arkady and Ella Rozenberg were not present.

We reject respondents' contention that the dismissal of the complaint was not subject to superior court review under section 871.5 because the dismissal was not pursuant to any of the statutes listed in that section. The magistrate did not cite any authority for his ruling but the motion was predicated on this court's opinion in *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252 [36 Cal.Rptr.2d 210] (*Morrow*) which, in part, was based upon section 1385, which is listed in section 871.5. (See, *post*, at p. 410.) The magistrate's ruling therefore was subject to section 871.5 review.

We conclude that the conversations in the Attorney General's office were privileged attorney-client communications that cannot be disclosed without the consent of the three respondents whose conversations were overheard. Substantial evidence supports a finding that three special agents of the Department of Justice intentionally eavesdropped on communications in both

---

[1] All statutory references are to the Penal Code unless otherwise stated.

the English and Russian languages between the three respondents and their attorneys. As we shall explain, our holding in *Morrow* does not require dismissal here. Accordingly, we reverse.

*Factual and Procedural Background*

The People filed a two-count felony complaint against respondents. Count 1 charged grand theft in violation of section 487, subdivision (a). The count included special allegations that the value of the property taken exceeded $1.3 million (§ 12022.6, subd. (a)(3)) and that the amount of the theft exceeded $100,000 (§ 1203.045). Count 2 charged the filing of fraudulent Medi-Cal claims in violation of Welfare and Institutions Code section 14107, subdivision (b)(1).

Before a preliminary hearing was held, Anna Gravich moved to dismiss the complaint "pursuant to the holding" in *Morrow*. The other respondents joined in her motion. The motion was supported by the declarations of three of respondents' attorneys. They declared as follows: "This case involves allegations of Medi-Cal fraud arising out of alleged illegal practices occurring at the Downtown Medical Clinic. . . . [A] search warrant was issued for patient records and files maintained at the clinic. Thousands of files were seized." Respondents "are operating under a joint defense agreement."

The parties agreed that respondents and their counsel would be allowed to "confidentially examine the seized medical files." The Attorney General "required that state law enforcement agents assigned to the case be present for examination of the medical files to ensure the integrity of the evidence." It was agreed that the agents' "visual monitoring of the files would not include monitoring of the conversations between clients and attorneys."

In October 2008 respondents Anna Gravich, Gersha Gravich, and Shrier reviewed the medical files "in a very large conference room" at the Attorney General's office in Burbank. Respondents were accompanied by Dmitry Gorin, counsel for Anna Gravich; Todd Melnik, counsel for Gersha Gravich; and Vicki Podberesky, counsel for Ella Rozenberg. Several agents were "on the perimeter of the room monitoring the review of evidence." These agents "listened in on and prepared a report documenting the confidential communications between counsel and clients." Gorin spoke to Anna Gravich "in Russian in a hushed tone." The "government" intentionally eavesdropped on their conversation by placing "a Russian-speaking agent in close proximity" to them. This agent was seated approximately five to 10 feet away. Counsel became aware of the eavesdropping when they received an agent's report containing "confidential attorney-client conversations, including those that took place in Russian."

The report was attached under seal to Anna Gravich's motion. Because the report remains under seal, we cannot, and do not, disclose the content of the attorney-client communications overheard by the agents. According to the report, Special Agent J. Timothy Fives was present in the conference room "for a short period of time." Fives speaks Russian. He was "sitting at a table near Gorin and Anna Gravich who were speaking in Russian while they were looking through a chart." He overheard their Russian conversations "as they went through charts page by page." When Fives was not present in the conference room, Special Agent Rochelle Deroian overheard communications in English between Gorin and both Anna and Gersha Gravich. Special Agent Laura Wilbur overheard conversations in English between Shrier and Podberesky as they "sat together reviewing charts."

The People did not file written opposition to respondents' motion. A hearing on the motion was conducted but the People did not present any evidence at the hearing. The prosecutor told the magistrate that "the material facts are not in dispute." The prosecutor went on to state: "If there's any dispute, it's as to what arrangements were made between the defense and the special agent [(Wilbur)], who made the arrangements. As far as who was in the room, where people were, what was overheard, I don't think that those are really in dispute." The prosecutor admitted that Wilbur asked "the Russian-speaking agent" (Fives) to sit "within a few feet" of Gorin and Anna Gravich.

The prosecutor characterized respondents' motion as "really a matter of law in the sense of applying the law to these facts that are non-disputable." The magistrate asked: "[T]he People have said that the facts, as stated in the declarations of defense counsel, are essentially correct and, especially, as to the major points. [¶] Is that correct?" The prosecutor replied, "Yes, your honor."

During argument on the motion, the prosecutor gave his own unsworn version of events: "[T]here was no discussion [with respondents' counsel] as to confidentiality in the sense of not listening in." There was no "agreement that whatever was said and overheard will not be used against you." Agent Wilbur had arranged for herself and two other agents to be present in the conference room while respondents and counsel were reviewing 80 medical files. The room was about 15 feet by 30 feet and contained three long conference tables. Wilbur had also selected a fourth agent, Fives, for "his Russian fluency knowing that the defendants spoke Russian and, also, one of the defense attorneys spoke Russian." The prosecutor "was unaware of these arrangements."

Unlike the other agents in the conference room, Fives had not worked on the case. The prosecutor came into the room and "did observe Agent Fives

sitting across the table from Mr. Gorin and his client." Fives was in the conference room for only about 15 minutes. After respondents and counsel had left the room, Wilbur told the prosecutor that the agents had overheard conversations between respondents and counsel. The prosecutor told Wilbur to prepare a report about what had been overheard.

The prosecutor argued that no sanctions should be imposed because respondents and counsel did not have a reasonable expectation of privacy as to the overheard conversations. The prosecutor asserted: "What we simply have is, that these attorneys spoke too loud . . . so that there were conversations that were able to be overheard" by law enforcement agents whose presence was known to everyone. "[I]t's simply a matter of the agents being in a place that they were entitled to be. They overheard conversations without making an effort to overhear them . . . ." "These defense attorneys took a chance by bringing their client[s] into the Attorney General's office to have confidential communications with them. That was their intent." The prosecutor acknowledged that the "defense attorneys were not aware that their conversations were being overheard." The attorneys "were speaking in low tones" because "[t]hey knew that if something was overheard, it could be used against them." But "the fault lies with the person who was speaking too loud . . . when they knew that a law enforcement officer was so close by and would overhear."[2]

Attorney Gorin protested: "Putting a Russian-speaking agent, intentionally, in front of me, knowing that . . . the review is going to be confidential . . . is completely and totally violative [of] what our system is all about. [¶] They knew in advance . . . that the lawyers and the clients were going to talk about sensitive confidential information." "[T]hey set a trap and took advantage of it." "I didn't think anybody could hear me. We were huddling shoulder to shoulder with about three boxes in front of me." "There's no other remedy in this case. . . . The only remedy in *Morrow* . . . is dismissal and I'm asking the court to follow that holding."

Attorney Melnik alleged that "the agreement that was struck [between the parties] was that the agents could be there in order to monitor the handling of the files, but they were not to listen to the conversations." "They surreptitiously inserted a Russian-speaking agent to eavesdrop on attorney/client confidential communications." "[W]hen Mr. Gorin, Dr. [Anna] Gravich and

---

[2] This argument borders on absurdity. The magistrate did not credit it. Neither do we. No reasonably competent defense attorney would "take a chance" like this. It is one thing to inadvertently overhear a confidential statement or hear a defendant blurt something out in a loud tone of voice. It is quite another thing to position oneself to intentionally listen to confidential attorney-client conversations. No prosecutorial agents should position themselves so they can intentionally eavesdrop upon attorney-client conversations.

my client [Gersha Gravich] are huddled over and they're speaking in hushed tones in Russian, there is clearly a reasonable expectation of privacy."

After the hearing, the magistrate took the matter under submission and thereafter announced his ruling: "The salient facts in this matter are virtually undisputed. Based on those facts, the court finds that the [respondents] and counsel had, throughout the procedure, a reasonable expectation of privacy and that the People intentionally pierced that confidentiality veil. [¶] Under these circumstances, the court further finds that the People's misconduct was outrageous within the meaning of due process and other constitutional safeguards. Said conduct cannot be accepted or glossed over. Therefore, the defense motion to dismiss is granted." The magistrate also ruled that the matter was dismissed "with prejudice."

In February 2009 the People unsuccessfully moved in the superior court to reinstate the complaint pursuant to section 871.5.

### Appealability and Standard of Review

■ The People may appeal from the order denying the motion to reinstate the complaint pursuant to section 871.5. (§ 1238, subd. (a)(9).) "[S]ection 871.5 is the exclusive method by which the People may obtain a review of a magistrate's order of dismissal." (*People v. Mimms* (1988) 204 Cal.App.3d 471, 481 [251 Cal.Rptr. 672].)

■ "When an action has been dismissed by the magistrate, Penal Code section 871.5 allows the prosecution to seek review in the superior court and request reinstatement of the charges 'under the same terms and conditions as when the defendant last appeared before the magistrate.' [Citation.] However, the prosecution may only seek reinstatement on the basis that 'as a matter of law, the magistrate erroneously dismissed the action or a portion thereof.' [Citation.]" (*People v. Dawson* (2009) 172 Cal.App.4th 1073, 1087 [91 Cal.Rptr.3d 841].) Section 871.5, subdivision (c), provides: "The superior court shall hear and determine the motion on the basis of the record of the proceedings before the magistrate." ■ "Thus, . . . a motion brought by the prosecution under section 871.5 is not a *relitigation* of the [issues before the magistrate]. Instead, it is simply a means to have the superior court determine the legal propriety of the magistrate's dismissal of the complaint . . . ." (*People v. Toney* (2004) 32 Cal.4th 228, 233 [8 Cal.Rptr.3d 577, 82 P.3d 778, 781].)

"On appeal from an order denying a motion to reinstate a criminal complaint under section 871.5, *we disregard the superior court's ruling and directly examine the magistrate's ruling to determine if the dismissal of the*

*complaint was erroneous as a matter of law*. To the extent the magistrate's decision rests upon factual findings, '[w]e, like the superior court, must draw every legitimate inference in favor of the magistrate's ruling and cannot substitute our judgment, on the credibility or weight of the evidence, for that of the magistrate.' [Citation.]" (*People v. Massey* (2000) 79 Cal.App.4th 204, 210 [93 Cal.Rptr.2d 890], italics added.) "We review the magistrate's legal conclusions de novo, but are bound by any factual findings the magistrate made if they are supported by substantial evidence." (*People v. Plumlee* (2008) 166 Cal.App.4th 935, 939 [83 Cal.Rptr.3d 172].)[3]

### *Superior Court's Jurisdiction to Entertain the Section 871.5 Motion*

■ Respondents contend that the dismissal of the complaint was not subject to superior court review under section 871.5 because the dismissal was not pursuant to any of the statutes listed in that section. " '[T]he plain language of 871.5 evidences an intent to permit superior court review of dismissal orders by magistrates when a complaint has been dismissed pursuant to specifically enumerated statutory authority, i.e., sections 859b, 861, 871, 1008, 1381, 1381.5, 1385, 1387 or 1389.' " (*People v. Williams* (2005) 35 Cal.4th 817, 827 [28 Cal.Rptr.3d 29, 110 P.3d 1239].)

■ The magistrate did not expressly specify any authority for dismissal of the complaint, but Anna Gravich's motion to dismiss was "pursuant to the holding" in *Morrow*. Respondents argue that the dismissal was based solely on nonstatutory federal and state constitutional grounds as specified in *Morrow*. We cannot agree. A close reading of our decision to dismiss in *Morrow* shows that it was based in part upon section 1385 factors as outlined in *People v. Superior Court* (*Howard*) (1968) 69 Cal.2d 491, 505 [72 Cal.Rptr. 330, 446 P.2d 138]. (*Morrow, supra*, 30 Cal.App.4th at p. 1263, fn. 4.) A *Morrow* dismissal therefore is not based solely on a finding of "outrageous conduct." (*Id.*, at pp. 1259–1261.) It also involves section 1385 considerations. Thus, irrespective of whether respondents sought section 1385 relief or whether the magistrate expressly relied upon section 1385, the determination to dismiss based upon *Morrow* necessarily implicates section 1385.

---

[3] On November 16, 2009, the People filed a motion to augment the record to include (1) a search warrant affidavit, and (2) the reporter's transcript of a hearing conducted on October 30, 2008. The magistrate who dismissed the complaint did not preside at this hearing. In an order filed on December 14, 2009, we treated the motion to augment as a request for judicial notice and deferred ruling on the request. We deny the request because neither the search warrant affidavit nor the reporter's transcript was before the magistrate when he dismissed the complaint. "The superior court shall hear and determine the motion on the basis of the record of the proceedings before the magistrate." (§ 871.5, subd. (c).)

The magistrate's rationale for the dismissal also makes it clear that the dismissal was intended to be "in furtherance of justice." (§ 1385.) The reason was "that the People's misconduct was outrageous within the meaning of due process and other constitutional safeguards." The magistrate's failure to expressly specify section 1385 as the statutory authority for the dismissal does not deprive the People of their right to seek review under section 871.5. (See *Chism v. Superior Court* (1981) 123 Cal.App.3d 1053, 1061–1062 [176 Cal.Rptr. 909] ["the magistrate's dismissal was on the exclusive ground of the denial of defendant's Fifth and Sixth Amendment rights in the prior prosecution of Esteen, presumably pursuant to Penal Code section 1385"]; *People v. Mackey* (1985) 176 Cal.App.3d 177, 186–187 [221 Cal.Rptr. 405] [dismissal of information for discovery violation that deprived defendant of due process was a dismissal in furtherance of justice pursuant to § 1385].)

### Privileged Attorney-client Communications

■ In *Morrow* "[t]he prosecutor told her investigator to sit next to the [courtroom] holding cell and listen to the conversation between defense counsel and [defendant]." (*Morrow, supra*, 30 Cal.App.4th at p. 1255.) The investigator acted pursuant to the prosecutor's instructions and surreptitiously overheard privileged attorney-client communications. We concluded that dismissal was the appropriate sanction because the prosecutor had engaged in conduct so outrageous that it violated the defendant's right to due process: "Where, as here, the prosecutor orchestrates an eavesdropping upon a privileged attorney-client communication in the courtroom and acquires confidential information, the court's conscience is shocked and dismissal is the appropriate remedy." (*Id.*, at p. 1261.)

■ The *Morrow* dismissal rule applies to privileged attorney-client communications. The privilege encompasses "a confidential communication between client and lawyer" (Evid. Code, § 954), which is defined as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons . . ." (*id.*, § 952). "The privilege is that of the client and not the attorney, and the client must intend that communications be confidential." (*Insurance Co. of North America v. Superior Court* (1980) 108 Cal.App.3d 758, 765 [166 Cal.Rptr. 880].) "The privilege authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client. [Citation.] . . . [T]he fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.]" (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 599 [208 Cal.Rptr. 886, 691 P.2d 642], fn. omitted.)

"On appeal, the scope of judicial review of a court's finding of the existence or nonexistence of the attorney-client privilege is limited. ' "When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it [citations]." ' [Citation.]" (*People v. Urbano* (2005) 128 Cal.App.4th 396, 403 [26 Cal.Rptr.3d 871].) "In applying the substantial evidence test, we view the facts in the light most favorable to the [prevailing party], resolving all conflicts in [its] favor and accepting all reasonable inferences deduced from the evidence. [Citation.]" (*Lazan v. County of Riverside* (2006) 140 Cal.App.4th 453, 458 [44 Cal.Rptr.3d 394].)

■ Viewing the evidence in the light most favorable to respondents, we conclude that substantial evidence supports the magistrate's finding that respondents' communications with counsel were protected by the attorney-client privilege. It is reasonable to infer that respondents reasonably believed these communications would be confidential and would not be overheard by the special agents, who were supposed to be present for the sole purpose of visually monitoring the inspection of the medical files. According to Attorney Gorin, "[t]he review of evidence took place in a very large conference room," and the agents were positioned "on the perimeter of the room." Agent Fives was the only agent identified by Gorin as having come within "close proximity" to his client. Gorin said: "I didn't think anybody could hear me. We were huddling shoulder to shoulder with about three boxes in front of me." To assure that the agents would not overhear Gorin's conversation with his client, Gorin "spoke . . . in Russian in a hushed tone." "Intrusion upon a client-lawyer conference, whether in the privacy of an office or at the counsel table in court . . . is particularly offensive where defendants have sought to keep their conversations and communications secret and confidential by resort to a foreign language." (*People v. Cooper* (1954) 307 N.Y. 253, 259 [120 N.E.2d 813, 816].)

The confidentiality of the attorney-client communications is further supported by statements of the two other attorneys who were present. Melnik declared: "There was an agreement" between the parties "that the Attorney General's visual monitoring of the files would not include monitoring of the conversations between clients and attorneys . . . ." Podberesky told the court that she was seated at one end of a long table that "might have been as long as counsel table in the courtroom." Agent Wilbur was seated at the other end. Podberesky went on to state: "I had positioned myself at the far end of the table for the sole purpose of making sure I wasn't overheard . . . . I tried to speak in a lower voice. . . . If something was overheard, it certainly wasn't intended to be overheard, in any way, because we sat at the opposite end of the table. There was no agent near us, except Agent Wilbur . . . ."

The prosecutor acknowledged in open court that counsel were not "speaking out loud with their clients." According to the prosecutor, counsel "admitted they're all speaking in hushed tones shoulder to shoulder." The prosecutor stated: "They [(counsel)] knew that if something was overheard, it could be used against them and that's why they were speaking in low tones."

We recognize that, except for the communications between Gorin and his client, Anna Gravich, the agents overheard communications between respondents and counsel who were not representing them. Agent Deroian overheard communications between Gersha Gravich and Gorin. Agent Wilbur overheard communications between Shrier and Podberesky, who represents Ella Rozenberg. Nevertheless, based on Podberesky's declaration, a reasonable trier of fact could find that all communications were protected by the attorney-client privilege. Podberesky declared: "The defendants in this case are operating under a joint defense agreement. Thus, all . . . communications among the joint defense group members and/or their clients in connection with the joint defense group members' representation of their respective clients are conducted and protected pursuant to California Evidence Code section 912(d) . . . ."

■ "Typically, a joint defense agreement protects information shared by defendants after a lawsuit has been filed, and it serves the purpose of protecting from disclosure the joint defendants' trial strategies and preparation." (*OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 893 [9 Cal.Rptr.3d 621]; see also 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) § 117, p. 178 [in a joint defense agreement, "multiple defendants with separate counsel agree to share information and agree that shared information will fall within the attorney-client privilege"].) The relevant statute, Evidence Code section 912, subdivision (d), provides: "A disclosure in confidence of a communication that is protected by a privilege provided by Section 954 (lawyer-client privilege) . . . , when disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer . . . was consulted, is not a waiver of the privilege." ■ "Thus, for example, the 'privilege extends to communications which are intended to be confidential, if they are made to attorneys, to family members, business associates, or agents of the party or his attorneys on matters of joint concern, when disclosure of the communication is reasonably necessary to further the interest of the litigant.' [Citation.]" (*OXY Resources California LLC v. Superior Court, supra*, 115 Cal.App.4th at p. 890.) "The nonwaiver concept [of section 912, subdivision (d),] has . . . been applied to protect the sharing of information among colitigants." (*Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 223 [58 Cal.Rptr.3d 275].)

"[P]arties may share privileged information when it furthers the attorney-client relationship." (*Id.*, at p. 224.)[4]

■ Because of the joint defense agreement, the magistrate properly applied the nonwaiver concept to the confidential communications that Shrier and Gersha Gravich made to counsel who were representing other respondents. Such communications were reasonably necessary for the accomplishment of the purpose for which Shrier and Gersha Gravich had consulted their own attorneys. The defense of the charges was apparently going to be a collaborative effort.[5] Because the conversations overheard by the agents are protected by the attorney-client privilege, they "may not be disclosed without the consent of the client or the client's representative. [Citations.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 817 [89 Cal.Rptr.3d 225, 200 P.3d 847].)

*Intentional Violation of Attorney-client Relationship*

The magistrate found that the agents had "intentionally pierced" the confidentiality of the attorney-client relationship by eavesdropping on conversations between respondents and counsel. The intentional nature of the agents' conduct is a factual finding that must be upheld if supported by substantial evidence.

Substantial evidence supports the magistrate's finding that Agent Fives was intentionally placed inside the conference room for the purpose of eavesdropping on Russian conversations between Gorin and respondents. Unlike the other agents in the conference room, Fives had not worked on the case. The prosecutor declared in open court: "They [(the agents who had been working on the case)] needed somebody else [to monitor the inspection of the medical files.] . . . [I]t's fair to conclude they picked [Fives] rather than somebody else because of his Russian fluency." Agent Wilbur "picked agent Fives,

---

[4] See also *Wilson P. Abraham Construction Co. v. Armco Steel Corp.* (5th Cir. 1977) 559 F.2d 250, 253: "The defendants persuasively argue that in a joint defense of a conspiracy charge, the counsel of each defendant is, in effect, the counsel of all for the purposes of invoking the attorney-client privilege in order to shield mutually shared confidences. We agree, and hold that when information is exchanged between various co-defendants and their attorneys that this exchange is not made for the purpose of allowing unlimited publication and use, but rather, the exchange is made for the limited purpose of assisting in their common cause."

[5] Shrier's counsel, Alexander Kirkpatrick, stated in open court that he had allowed his client to view the medical files with Attorney Podberesky because he had "represented to [her] that Dr. Shrier had certain observations that were important to understanding what was in these charts." Several months earlier, Kirkpatrick and Shrier had "spent four hours or so looking at those records." Gersha Gravich's attorney, Melnik, declared: "The Gravich's [*sic*] have similar interests in the case, and at times Mr. Gorin and myself have met with both [respondents] to discuss the case. It was not unusual for Mr. Gorin to converse with Mr. [Gersha] Gravich, or myself to converse with Dr. [Anna] Gravich."

specifically, because he spoke Russian. . . . If they [(Gorin and his client)] were to speak too loud, he would understand what they were saying." "The Russian-speaking agent sat within a few feet [of Gorin and his client] and overheard conversations . . . . [¶] So he [(Fives)] had no motivations other than to do as he was told and afterwards he reported what he overheard to the case agent [(Wilbur)]."

Based on the prosecutor's statements and the evidence, it is reasonable to infer that Agent Wilbur told Fives to sit within a few feet of Gorin and his client not because she needed him to assist in monitoring the inspection of the medical files, but because she wanted him to eavesdrop on attorney-client communications in Russian. There were already three agents in a conference room that was about 15 feet by 30 feet. These agents were monitoring the conduct of three attorneys and three defendants. The People have failed to advance any justification for the need of a fourth agent. It is reasonable to infer that three agents were enough to adequately monitor the conduct of the six persons in the conference room. Thus, a logical explanation for Agent Fives's presence is that he was there to engage in eavesdropping.[6]

Unlike Agent Fives, Agents Wilbur and Deroian did not speak Russian and overheard conversations in English. The People argue that the only reasonable inference to be drawn from the evidence is that Wilbur and Deroian did not intentionally eavesdrop on these conversations; instead, they simply overheard portions of the conversations while positioned where they had a right to be. In contrast to Agent Fives, Wilbur and Deroian were entitled to be in the conference room because they were working on the case. The parties' agreement contemplated that "agents assigned to the case" would "be present for examination of the medical files to ensure [their] integrity."

No direct evidence was presented that Wilbur or Deroian came closer to respondents than necessary to monitor the inspection of the medical files. But there was circumstantial evidence to this effect. The circumstantial evidence consisted of Wilbur's deliberate positioning of Agent Fives in the conference room so that Fives would be able to eavesdrop on confidential attorney-client communications in Russian. Since Wilbur was the agent in charge of making the arrangements for the monitoring of the records inspection, the circumstantial evidence tarnishes both Wilbur and Deroian. Based on this evidence, a reasonable trier of fact could find that Wilbur and Deroian intentionally positioned themselves so that they would be able to eavesdrop on confidential attorney-client communications in English. Their success in eavesdropping

---

[6] The People contend that Fives replaced one of the agents who had "left the room for 15 minutes." The People's citations to the record do not support this contention. The prosecutor told the court, "[W]hen she [(Wilbur)] needed another agent to *supplement* the three agents who had been working on the case, she picked agent Fives . . . ." (Italics added.)

supports the conclusion that this was their plan. Thus, substantial evidence supports the magistrate's finding that Wilbur and Deroian "intentionally pierced" the confidentiality of the attorney-client relationship.

■ In *Schaffer v. Superior Court* (2010) 185 Cal.App.4th 1235, 1245 [111 Cal.Rptr.3d 245], we emphasized the importance of preserving the confidentiality of attorney-client communications during the inspection of records discoverable by the defense: "In the event a defendant or his counsel chooses not to pay reasonable duplication fees, the district attorney must make reasonable accommodations for the defense to view the discoverable items in a manner that will protect attorney-client privileges and work product. There are many ways to achieve this. By way of example, the district attorney could allow the defendant and his counsel to view the items in private or in a discrete location where their conversation would not be overheard by the district attorney's staff but precautions could be made to protect against theft or destruction. We assume the parties and their counsel will conduct themselves according to the high standards the legal profession demands. Should any dispute arise over the accommodations, we are confident the trial court will know how to resolve it." Although the instant eavesdropping occurred before our opinion in *Schaffer* was filed, the prosecutor and Agent Wilbur did not need *Schaffer* to educate them as to their duty to preserve the confidentiality of attorney-client communications during records inspections.

### The Remedy Is Not Dismissal

In *Morrow* we decided that, given the particular circumstances of that case, dismissal was the appropriate remedy for intentional eavesdropping on privileged attorney-client communications. As we shall explain, the *Morrow* remedy is not here appropriate because *Morrow* is fairly and factually distinguishable.

■ In *Morrow* "[t]he eavesdropping occurred inside a courtroom and was orchestrated by the prosecutor, an officer of the court." (*Morrow, supra,* 30 Cal.App.4th at p. 1260.) Thus, "the misconduct took place within the hallowed confines of the courtroom where the rule of law and fairness should be revered." (*Id.,* at p. 1261.) Furthermore, the misconduct violated the "higher ethical standards" that courts expect from prosecutors. (*Id.,* at p. 1262.) "Our justice system will crumble should those, in whose hands are entrusted its preservation and sanctity, betray its fundamental values and principles." (*Id.,* at p. 1261.) "While district attorneys are expected to

prosecute their cases with considerable vigor and dispatch, they 'may strike hard blows, [but are] not at liberty to strike foul ones.' [Citations.] By conspiring to violate [defendant's] constitutional rights, the prosecutor struck a foul blow." (*Id.*, at p. 1262.) "The prosecutor '. . . used methods that offend "a sense of justice." ' [Citation.]" (*Id.*, at p. 1263.) We therefore concluded: "Where, as here, the prosecutor orchestrates an eavesdropping upon a privileged attorney-client communication in the courtroom and acquires confidential information, the court's conscience is shocked and dismissal is the appropriate remedy." (*Id.*, at p. 1261.)

*Morrow* is distinguishable for several reasons. First, unlike *Morrow*, the eavesdropping in the instant case was orchestrated by Agent Wilbur, not the prosecutor who was unaware of the eavesdropping plan. Thus, in contrast to the prosecutor in *Morrow*, the prosecutor here did not strike "a foul blow" by "conspiring to violate [respondents'] constitutional rights." (*Morrow, supra*, 30 Cal.App.4th at p. 1262.)

Second, the eavesdropping did not occur "within the hallowed confines of the courtroom." (*Morrow, supra*, 30 Cal.App.4th at p. 1261.) The instant eavesdropping occurred inside a conference room at the Attorney General's office in Burbank. In *Morrow* we noted that a courtroom is entitled " 'to be called a temple of justice.' [Citation.]" (*Ibid.*) The Attorney General's conference room cannot be similarly characterized. Because the eavesdropping here did not occur in a courtroom, it was not as egregious as the eavesdropping in *Morrow*.

Third, in *Morrow* the defendant called the prosecutor and investigator as witnesses at the hearing on the motion to dismiss. Both claimed the privilege against self-incrimination and refused to testify. "Based upon the evidence presented or rather, the lack of it, [the trial] court could not have made a reliable finding as to what the investigator overheard." (*Morrow, supra*, 30 Cal.App.4th at p. 1258.) We concluded: "Where a prosecutor orchestrates courtroom eavesdropping on a privileged attorney-client communication and the witnesses thereto invoke the privilege against self-incrimination, the prosecution may not successfully oppose a motion to dismiss on the ground that no prejudice has been shown." (*Ibid.*) Here, neither the prosecutor nor the agents refused to testify. Respondents did not call them as witnesses. The content of the attorney-client conversations is set forth in a confidential report under seal. There is no indication that the

conversations disclosed material facts not already known to the prosecution. Because the conversations are protected by the attorney-client privilege, they may not be disclosed without the consent of the clients. (*People v. Gutierrez, supra,* 45 Cal.4th at p. 817.)

 Fourth, in contrast to *Morrow*, a number of factors here militate against a dismissal of the complaint. In *Morrow* we declared: "Cases of outrageous conduct and the appropriate sanctions . . . are sui generis. Each case must be decided on its own facts. [¶] In ordering dismissal, we have considered the nature of the crime charged, the fact that [defendant] has been incarcerated for approximately one year awaiting trial, the harassment that he has endured at the hands of the prosecutor and her investigator, and the burdens that he may confront were we to permit the case to proceed to trial." (*Morrow, supra,* 30 Cal.App.4th at p. 1263, fn. 4.) The defendant in *Morrow* was charged with simple residential burglary, which is a serious offense. Respondents are charged with a far more serious offense: a complex and continuing scheme to defraud the Medi-Cal program of more than $1.3 million. If the charge is true, it constitutes a brazen and ambitious attack upon the public fisc. The prosecution of a crime of this nature and magnitude is of critical importance to society. Unlike the defendant in *Morrow*, respondents have been released on bail. Harassment of respondents is limited to the eavesdropping.

 " '[T]he sanction of dismissal is clearly discretionary and is only required in particularly egregious cases.' [Citation.]" (*Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, 435 [233 Cal.Rptr. 487].) In view of the totality of the circumstances, the eavesdropping on respondents was not so egregious as to require dismissal. As we have shown, the situation here is a far cry from the situation in *Morrow*.

### *The Remedy Is an Exclusionary Order and/or Other Sanctions to Be Fashioned by the Superior Court*

 Having ruled that the dismissal of the criminal action is not warranted, we turn to the appropriate remedy. Respondents claim that the People should not be permitted to ask for a lesser remedy than dismissal for the first time on appeal. We reject this contention. An exclusionary remedy may have been superfluous at the preliminary hearing stage, where the "magistrate's role is limited to determining whether *a reasonable person* could harbor a strong suspicion of the defendant's guilt . . . ." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 251–252 [127 Cal.Rptr.2d 177, 57 P.3d 654].) The People have, at all times, claimed that they can prove the underlying case at

the preliminary hearing without resort to use of the evidence they gathered in the conference room. Such a remedy is, however, important at the contemplated trial in superior court, where the People must prove guilt beyond a reasonable doubt. In addition, we question whether a magistrate could fashion such an exclusionary order which would be binding on the superior court. (See, e.g., *People v. Sons* (2008) 164 Cal.App.4th 90, 100 [78 Cal.Rptr.3d 679].) A magistrate has limited powers. "The authority of a magistrate is purely statutory; he is not a judge. [Citation.]" (*People v. Miskiewicz* (1984) 158 Cal.App.3d 820, 824 [204 Cal.Rptr. 873].) "Purely 'a creature of statute' (§§ 807, 808), a magistrate 'possesses only the limited jurisdiction and magistral powers conferred by the state Constitution and statute.' [Citations.]" (*People v. Silverbrand* (1990) 220 Cal.App.3d 1621, 1627 [270 Cal.Rptr. 261].)

In any event, the People may raise the exclusionary sanction for the first time on appeal because the relevant facts—whether the special agents intentionally eavesdropped on confidential attorney-client communications—were resolved in respondents' favor by the magistrate. The issue of the appropriate remedy, therefore, involves a pure question of law. A party may raise a new theory on appeal where it involves a purely legal question. (See, e.g., *People v. Butler* (1980) 105 Cal.App.3d 585, 588 [164 Cal.Rptr. 475].)

The judiciary should not be a party to any exploitation of illegally obtained evidence at trial. If respondents are held to answer at the preliminary hearing, the superior court shall exercise broad discretion in fashioning a remedial order. At a minimum it shall bar the use of any information gleaned from the eavesdropping and any derivative evidence which may have flowed therefrom. The People shall have the burden to show that any People's evidence sought to be introduced has an independent origin from the eavesdropping. The burden of proof is beyond a reasonable doubt. In addition, the superior court may make any other order or impose any other sanction which it deems appropriate. (See, e.g., *Wilson v. Superior Court* (1977) 70 Cal.App.3d 751, 760 [139 Cal.Rptr. 61].)

*Conclusion*

Like the magistrate, we deplore the conduct of these Department of Justice special agents and sincerely hope that this is an isolated incident. A prosecutor is the guardian of the constitutional rights of everyone, even criminal defendants. (*Morrow, supra*, 30 Cal.App.4th at p. 1254.) A prosecutor should supervise his or her agents. They are not permitted to unilaterally eviscerate constitutional and statutory rights in their zeal to obtain incriminating evidence.

*Disposition*

The order denying the People's motion to compel the magistrate to reinstate the complaint is reversed. The superior court is directed to enter a new order granting the motion and returning the case to the magistrate for resumption of the proceedings. The magistrate is directed to exclude all evidence of attorney-client communications heard by the Department of Justice's special agents in the Attorney General's conference room.

Coffee, J., and Perren, J., concurred.

A petition for a rehearing was denied December 13, 2010, and respondents' petitions for review by the Supreme Court were denied March 16, 2011, S189393.