Filed 11/20/24  P. v. Triplett CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062399 |
| v. | (Super. Ct. No. 19CF2608) |
| ANTONIO LAMONT TRIPLETT, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed as modified.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin H. Urbanski and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Antonio Lamont Triplett participated in an armed robbery. Triplett and his cohorts knew the victim was transporting thousands of dollars in cash from a marijuana dispensary in Los Angeles to Tustin by car. They waited outside the dispensary and followed the victim's car, which eventually led to a high-speed car chase over surface streets in Santa Ana. During this high-speed pursuit, one of Triplett's cohorts fired a gun at the victim's car. The robbers eventually rammed the victim's car from behind, causing it to veer off the road and crash at a high speed. After the crash, Triplett and another man (suspect 1) ran out of their car towards the victim's car, and suspect 1 fired several shots at the victim. The gunfire did not immediately kill the victim, so suspect 1 proceeded to beat him. The victim died a few minutes later from gunshot wounds.

Triplett was found guilty of second degree robbery and first degree murder with a robbery special circumstance. His murder conviction was based on a theory that he was a major participant in the robbery and acted with reckless indifference to human life during its commission. Triplett was sentenced to life in prison without the possibility of parole for the murder and also given five years for the robbery, which was stayed under Penal Code section 654.[1]

On appeal, Triplett primarily contends there is insufficient evidence to support the jury's finding that he was a major participant and acted with reckless indifference to human life. We disagree. The record contains evidence showing Triplett helped plan the robbery, was aware of the danger posed to the victim's life, did nothing to prevent the shooting or the assault, and provided no aid to the victim after the attack. Next, Triplett

[1] All further undesignated statutory references are to the Penal Code.

2

argues the court erred by imposing a parole revocation fine because he was sentenced to life in prison without the possibility of parole. We agree the fine was improperly imposed and must be stricken from the judgment. The judgment is affirmed in all other respects.

FACTS AND PROCEDURAL HISTORY

I.

BACKGROUND

A jury found Triplett guilty of first degree murder (§ 187, subd. (a)) and second degree robbery (§§ 211, 212.5, subd. (c)). It also found true a special circumstance that the murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17)(A)). Triplett was sentenced to life in prison without the possibility of parole for the special circumstance murder. He was also given a five-year sentence for the robbery, which was stayed under section 654. The trial court also imposed various fines, including a $300 parole revocation fine (§ 1202.45, subd. (a)).

The evidence at trial was largely undisputed. The victim worked at a marijuana dispensary in South Los Angeles (the dispensary). It was an all-cash business. The dispensary would take in around $20,000 a day on weekdays and $30,000 a day on weekends. It generally operated from 10:00 a.m. to 1:00 a.m. It was protected by four armed guards during business hours, and it was also monitored by surveillance cameras.

The victim was responsible for picking up the cash from the dispensary every day and transporting it to the company's office in Tustin. He generally followed the same daily routine. After arriving at the dispensary, he would stay for about an hour. Before the victim left the dispensary, he would load the day's cash receipts into a backpack, put the

3

backpack in the trunk of his own car, and then drive the cash to Tustin. He was unarmed when transporting the cash.

As explained in the next section, on September 15, 2019, Triplett along with Miah Mendoza, Ryan Jones, and John Taylor executed a plan to rob the victim, which led to the victim's death.[2] Mendoza was a former employee at the dispensary, who left her job in August 2019. The victim was her former boss, and she knew he was responsible for transporting the cash away from the dispensary. Mendoza was dating Jones while she worked at the dispensary, and he visited her there regularly during her employment. Through their relationship, Mendoza met Triplett, who was Jones's uncle, and Taylor, who was Jones's cousin.[3]

## II.

### THE ROBBERY

On September 15, 2019, the victim arrived at the dispensary and began putting the day's cash receipts into his backpack sometime between 11:00 p.m. and midnight. He then walked to the dispensary's parking lot and put the backpack in the trunk of his car. Around the time he left the dispensary, the victim called his girlfriend, Carmen M., and planned to meet her later that night for burgers.

---

[2] Mendoza testified at Triplett's trial after receiving a grant of use immunity. Others were also implicated in the robbery, but their involvement is immaterial to this appeal.

[3] Mendoza was not sure whether Jones was blood related to Triplett and Taylor or whether he just referred to them as his uncle and cousin.

Also on September 15, between the hours of 5:59 p.m. and 11:57 p.m., there were 13 mobile phone calls between Jones's phone and phones of Triplett, Taylor, or Mendoza. Four of these calls involved Triplett's phone:

- A phone call between Triplett and Jones at 5:59 p.m. for an unspecified duration (the testimony does not indicate who placed the phone call);
- A phone call from Triplett to Jones at 10:09 p.m. for an unspecified duration;
- A phone call from Triplett to Jones at 10:48 p.m. that lasted 20 seconds; and
- A phone call from Jones to Triplett at 11:03 p.m. that lasted for 23 seconds.[4]

There were also at least two phone calls between Triplett and Taylor during this time:

- A phone call from Triplett to Taylor at 10:48 p.m. that lasted for 1 minute and 27 seconds; and
- A phone call from Triplett to Taylor at 11:05 p.m. that lasted for 39 seconds.

Evidence from trial shows Jones drove to the dispensary around 11:00 p.m. He arrived there shortly after 11:30 p.m. At some point that night, Triplett and Taylor appear to have met Jones near the dispensary, and the three men got into the same car.

In "the early morning hours" of September 16, the victim called Carmen M. He was panicked and scared. The victim told Carmen M., "'[t]hey're following me,' and, 'they're shooting at me. They're going to kill me. They want to kill me.'" The victim stated he was close to Santa Ana College.

---

[4] There were five calls between Jones and Taylor and four calls between Jones and Mendoza.

Carmen M. heard a loud noise. She then heard multiple people yelling unspecified demands at the victim and heard the victim say, "'[n]o, no, no.'"

Multiple surveillance cameras at Santa Ana College recorded the robbery. At 12:54 a.m. on September 16, a camera recorded the victim's car being closely pursued at a high speed by another car (the suspects' car) on Bristol Street. The victim's car appears to momentarily lose control and sideswipe a stopped car that was preparing to make a left turn onto 17th Street. The two cars were picked up by different cameras less than a minute later. The videos show the suspects' car bump the victim's car from behind, causing the victim to lose control of his car. The victim's car runs off the street, onto the sidewalk, and crashes into some hedges separating the parking lot of Santa Ana College from Bristol Street. The suspects' car stops, and two men exit the vehicle together while the driver remains inside. The first man is wearing all black (suspect 1). The second person, identified as Triplett, is wearing a light gray t-shirt.[5]

The videos show suspect 1 quickly move to the driver's side of the victim's car and fire seven gunshots, presumably at the victim, while Triplett stands near suspect 1. Suspect 1 then moves to the rear of victim's car and fires two more shots. While both suspects stand near the rear of the victim's car, the victim slowly crawls out of his car through the window of the front passenger-side door and onto the ground. Suspect 1 then walks over to the victim and beats him. The trunk of the victim's car opens while suspect 1 is still near its front passenger side. Based on the evidence discussed below, we

[5] At Triplett's trial, the prosecution did not attempt to positively identify suspect 1. However, it suggested Taylor was suspect 1 and Jones was the driver.

can infer that Triplett took the backpack with the cash from the trunk around this time.

Video evidence shows that Triplett and suspect 1 remained at crash site and engaged in indiscernible activity for a short while after the beating. About two and a half minutes after the crash, a police car drives past the crash scene without stopping. After seeing the police car, Triplett runs from the crime scene on foot with a backpack. Multiple surveillance cameras on the Santa Ana College campus captured Triplett fleeing on foot while holding the backpack.

As for suspect 1, surveillance video shows him standing next to the passenger door of the suspects' car when the police car drives past the crime scene. After the police car drives past, suspect 1 enters the suspects' car, but the car remains at the crime scene for another one and a half minutes. It then slowly reverses down the street (going against the flow of traffic) and out of frame.[6]

The police arrived on the scene a few minutes after Triplett and the two other suspects had left. The victim's backpack was not in the victim's car when the police arrived. Thus, it can be reasonably inferred Triplett took the victim's backpack and was holding it when he fled. Neither the victim's backpack nor the money was ever recovered.

The victim's car had six bullet holes on the driver's side door and one bullet hole on the passenger side door. Four bullet cores were located – two in the car's sunroof, one inside the driver's door panel, and one inside the

_____

[6] About a minute after the suspects' car drives out of frame, a car that resembles the suspects' car enters the frame and stops by the victim's car. Someone exits this vehicle, walks over to the victim's car for a few seconds, and then returns to their vehicle. The car then drives out of frame. It is unclear whether this vehicle was the suspects' car or another car.

passenger door inside panel. There were markings on the rear of the driver's side of the victim's car, which police believed were caused by contact from the tire of another vehicle. There was also damage on the rear of the passenger side of the victim's car, which appeared to have been caused by a collision with another vehicle moving laterally. During trial, a witness explained that "the application of lateral force at that particular location of the car . . . is likely to induce a spin or rotation of the car in a clockwise direction." Witness testimony established this maneuver was likely intended to cause the victim's car to lose control.

An autopsy revealed the victim had eight gunshot wounds, which caused his death. Testimony at trial established the victim would have died within minutes of sustaining these injuries. The victim also sustained other injuries including (1) multiple lacerations to his head, which were caused by a hard, blunt object; and (2) multiple abrasions on his arms and hands that were potentially defensive injuries.

One of the suspects took the victim's phone from the crime scene. The police were able to use it to track the suspects. Triplett was arrested with Taylor around 7:00 a.m. on September 16, 2019. Triplett's shoes had traces of the victim's blood on them.[7]

Triplett was convicted of murder under a felony-murder theory that required the prosecution to prove he was a major participant in the robbery and acted with reckless indifference to human life during its commission. He challenges his murder conviction on appeal, arguing there is insufficient evidence he was either (1) a major participant in the robbery, or (2) that he acted with reckless indifference to human life. He also asserts the

_____

[7] Taylor's DNA was found on the victim's phone but Triplett's DNA was not.

court erred by imposing a $300 parole revocation fine. We affirm his murder conviction but find the parole revocation fine was improperly imposed.

DISCUSSION

I.

MURDER CONVICTION

*A. Background Law*

"A participant in the perpetration . . . of a [robbery] in which a death occurs is liable for murder" if "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e)(3).) On appeal, "[w]hether [the defendant] was a major participant in the underlying felonies who acted with reckless indifference to human life is predominantly a factual question reviewable for substantial evidence." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480.) "'In applying the substantial evidence test, we view the facts in the light most favorable to the [prevailing party], resolving all conflicts in [its] favor and accepting all reasonable inferences deduced from the evidence.'" (*People v. Shrier* (2010) 190 Cal.App.4th 400, 412.)

A defendant's culpability for felony murder is judged on a spectrum. As our state Supreme Court explained in *People v. Banks* (2015) 61 Cal.4th 788, 799–802 (*Banks*), two United States Supreme Court cases are useful in understanding the opposing ends of this spectrum: *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*). Both *Tison* and *Enmund* analyzed the constitutionality of imposing the death penalty in felony-murder cases. But California courts have applied their analysis in assessing felony-murder culpability in noncapital cases. (See, e.g., *Banks*, at pp. 799–802.)

9

In *Enmund*, "defendant Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person. A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found. He was convicted of robbery and first degree murder and sentenced to death." (*Banks*, *supra*, 61 Cal.4th at p. 799.)

"On these facts, the United States Supreme Court reversed Enmund's death sentence as prohibited by the federal Constitution. The court found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.] Accordingly, it held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' [Citation.] The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' [citation], a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape' [citation] cannot constitutionally be sentenced to death." (*Banks*, *supra*, 61 Cal.4th at p. 799.)

The United States Supreme Court revisited this issue again in *Tison*. "Prisoner Gary Tison's sons Ricky, Raymond, and Donald Tison conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint. During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to

flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. Ricky and the cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four family members. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, only to die of exposure. [Citation.] Ricky and Raymond Tison and the cellmate were tried and sentenced to death. The trial court made findings that Ricky and Raymond's role in the series of crimes was "'very substantial'" and they could have foreseen their actions would "'create a grave risk of . . . death.'"" (*Banks*, *supra*, 61 Cal.4th at pp. 799–800.)

"The United States Supreme Court granted Ricky's and Raymond's petitions to consider the application of *Enmund* to these facts. The court began by discussing at length and endorsing *Enmund*'s holding that the Eighth Amendment limits the ability of states to impose death for 'felony murder simpliciter.' [Citation.] Specifically, *Tison* described the range of felony-murder participants as a spectrum. At one extreme were people like 'Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.] At the other extreme were actual killers and those who attempted or intended to kill. [Citation.] Under *Enmund*, *Tison* held, death was disproportional and impermissible for those at the former pole, but permissible for those at the latter. [Citation.] The Supreme Court then addressed the gray area in between, the proportionality of capital punishment for felony-murder participants who, like the two surviving Tison

11

brothers, fell 'into neither of these neat categories.' [Citation.] Here, the court announced, 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.'" (*Banks*, *supra*, 61 Cal.4th at p. 800.) The Supreme Court then remanded *Tison* back to state court so it could apply the correct standard. (*Tison*, *supra*, 481 U.S. at p. 138.)

As explained by our state Supreme Court, "*Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund. The defendants' actions in [*Tison*] and [*Enmund*] represent points on a continuum. [Citation.] Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for" felony-murder culpability. (*Banks*, *supra*, 61 Cal.4th at pp. 802, 804; § 189, subd. (e)(3).)

As we detail in the next two sections, this case is closer to *Tison* then *Enmund*. The evidence shows Triplett was not simply a getaway driver with little connection to the robbery or the fatal shooting. Rather, it can be reasonably inferred from the evidence that Triplett chose to participate in a violent robbery, which involved using gunfire and the suspects' car to force the victim's car off the road. Triplett was aware of the danger to the victim's life based on how the robbery unfolded, but nothing in the record shows he tried to intervene or take any steps to minimize the violence. Nor did Triplett attempt to help the victim at any point. As such, there is sufficient evidence to affirm Triplett's murder conviction.

## B. Major Participant

"[A] 'major participant' in a robbery is someone whose 'personal involvement' is 'substantial' and 'greater than the actions of an ordinary

12

aider and abettor . . . .' [Citation.] However, he or she 'need not be the ringleader.'" (*In re Harper* (2022) 76 Cal.App.5th 450, 459.) Factors that courts consider are (1) "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? [(2)] What role did the defendant have in supplying or using lethal weapons? [(3)] What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? [(4)] Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? [(5)] What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

As to the first factor, a jury could reasonably infer Triplett had some involvement in planning the robbery given the call activity in the hours leading up to the robbery. As set forth above, there were several calls between Triplett and Jones and also Triplett and Taylor prior to the robbery. Based on these communications, a jury could reasonably infer Triplett, Jones, and Taylor were all involved in planning the robbery.

The second factor is neutral. There is no evidence Triplett was armed or that he supplied the gun used to shoot the victim.

The third factor cuts heavily against Triplett. The evidence shows Triplett knew of the dangers posed by the robbery. Triplett and the other two suspects followed the victim's car after it left the dispensary. This led to a

high-speed pursuit. Further, the testimony from Carmen M. and the bullet holes in the driver's and passenger's sides of the victim's car indicate one of the suspects fired multiple shots at the victim's car during this chase. The suspects' car eventually forced the victim's car off the road, causing it to crash. Even if Triplett did not know the two other men intended to shoot at the victim's car and/or force it off the road, it became clear during the course of the robbery that the crime posed a serious risk to the victim's life. (See, e.g., *People v. Montanez* (2023) 91 Cal.App.5th 245, 273–274 [the defendant could observe warning signs of danger to the victims as the crimes unfolded].) Triplett was in the car when the high-speed chase began and when one of the suspects fired multiple shots at the victim's car. At the very least, he was aware one of the other suspects had a gun and was willing to fire it at the victim. From this evidence, a jury could reasonably infer Triplett was aware the robbery posed a danger to the victim's life before the victim's car crashed.

For similar reasons, the fourth factor also cuts strongly against Triplett. As set forth above, Triplett was in the car during the high-speed chase and witnessed one of the other suspects firing at the victim's car during the pursuit. He knew one of his accomplices was armed prior to the car crash. Yet nothing in the record shows he did anything to prevent the murder. Rather, after forcing the victim's car off the road and causing it to crash, suspect 1 and Triplett exited their car and ran to the victim's car together. Suspect 1 then fired seven shots at the victim, while Triplett stood next to him or near him. Suspect 1 then moved to a different angle and fired two more shots at the victim. Nothing in the video signals any surprise, shock, or hesitation by Triplett. Rather, he continued with the robbery and took the backpack from the victim's car. Given their seemingly coordinated

14

movements and Triplett's lack of hesitation or surprise, a jury could reasonably infer Triplett knew suspect 1 intended to shoot the victim.

Moreover, the victim was alive after suspect 1 finished shooting at him. The video evidence shows him crawling on the ground after the gunshots. Suspect 1 then went over to the victim and beat him for what appears to be at least 20 seconds. Although Triplett was standing in the area, he did nothing to prevent suspect 1 from beating the victim. Nor did he call for help or otherwise offer any aid to the victim after the shooting or the beating.

Triplett's lack of intervention is especially striking given that lethal force did not appear necessary to complete the robbery. This is not a case where the victim resisted or was shot due to surprise or panic. The victim had just been involved in a violent car crash and was unarmed. Nothing in the record shows he posed any threat to the robbers, and it appears they could have easily taken the backpack without killing the victim.

Finally, as to the fifth factor, Triplett stayed around the crash site for over one and a half minutes after suspect 1 had beat the victim. As set forth above, he offered no help or assistance. He then ran from the scene after a police car drove past.

Four of the five factors cut against Triplett, while the remaining factor is neutral. In particular, the third and fourth factors weigh heavily against him. Based on the evidence discussed above, a jury could reasonably conclude that Triplett was a major participant in the robbery.

C. *Reckless Indifference to Human Life*

"Reckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death."'" (*Banks*, *supra*, 61 Cal.4th at p. 807.) There is significant

15

overlap between the reckless indifference and major participant requirements. "'[T]he greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).) In cases where a defendant is found to be a major participant in a felony, "'that fact [will] often provide significant support for [a reckless indifference] finding.'" (*Ibid.*)

In determining whether a defendant acted with reckless indifference to human life, courts consider (1) the defendant's "knowledge of weapons, and use and number of weapons"; (2) the defendant's "physical presence at the crime and opportunities to restrain the crime and/or aid the victim"; (3) "duration of the felony"; (4) "defendant's knowledge of cohort's likelihood of killing"; and (5) "defendant's efforts to minimize the risks of the violence during the felony." (*Clark*, *supra*, 63 Cal.4th at pp. 618–622, capitalization & italics omitted.)

None of the above factors "'is necessary, nor is any one of them necessarily sufficient.'" (*Clark*, *supra*, 63 Cal.4th at p. 618.) However, "[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Clark, supra*, 63 Cal.4th at p. 619.) "A defendant's knowledge of factors bearing on a cohort's likelihood

16

of killing are significant to the analysis . . . . Defendant's knowledge of such factors may be evident before the felony or may occur during the felony." (*Id.* at p. 621.)

The evidence discussed in the prior section is applicable here. Triplett was aware his accomplices were willing to use lethal force prior to the murder. A jury could reasonably infer suspect 1 was the same person that fired at the victim's car during the car chase since the second suspect was driving. Thus, Triplett was aware suspect 1 was armed and willing to shoot at the victim. Yet, after the victim's car crashed, Triplett ran with suspect 1 to the victim's car and stood near suspect 1 as he fired at the victim nine times. He was also in the area when suspect 1 beat the victim. Nothing in the record shows Triplett tried to restrain suspect 1 or prevent any of this violence from occurring. Finally, Triplett did not do anything to seek aid or assist the victim after either the shooting or the beating. Based on this evidence, a jury could reasonably conclude Triplett shared the same mental state as suspect 1 and displayed a reckless indifference to human life.

II.

THE PAROLE REVOCATION FINE

A court shall impose a parole revocation fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole . . . ." (§1202.45, subd. (a).) "A parole revocation fine may not be imposed for a term of life in prison without possibility of parole, as the statute is expressly inapplicable where there is no period of parole." (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.)

Triplett argues the $300 parole revocation fine must be stricken because his sentence does not include a parole period. Though he was sentenced to five years for the robbery count, this sentence was stayed under

17

section 654. The Attorney General's office does not expressly concede the argument, but it does acknowledge the trial court may have erred by imposing the fine. We conclude the fine was improperly imposed.

Our analysis is guided by two cases. In *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181–1182 (*Oganesyan*), the defendant was sentenced to an indeterminate life sentence for second degree murder plus life without the possibility of parole for a first degree special circumstance murder. The appellate court held a parole revocation fine could not be imposed because the defendant's sentence did not allow for parole. It explained that "the language of section 1202.45 indicates that the overall sentence is the indicator of whether the additional restitution fine is to be imposed. Section 1202.45 indicates that it is applicable to a 'person . . . whose sentence includes a period of parole.' At present, defendant's 'sentence' does not allow for parole. [B]ecause the sentence does not presently allow for parole and there is no evidence it ever will, no additional restitution fine must be imposed." (*Id*. at p. 1185.)

In *People v. Brasure* (2008) 42 Cal.4th 1037, the defendant was convicted of first degree murder and several other felonies. He was sentenced to death for the murder and given an aggregate term of two years and eight months on the remaining felony counts. (*Id*. at p 1049.) Given his death sentence, he argued on appeal that the trial court had improperly imposed a $10,000 parole revocation fine. The Supreme Court disagreed. It reasoned that since the defendant had been sentenced to a determinate prison term, his sentence "'include[d] a period of parole.'" (*Id*. at p. 1075.) It distinguished *Oganesyan* "as involving no determinate term of imprisonment imposed under section 1170, but rather a sentence of life without the possibility of

18

parole for first degree special circumstance murder and an indeterminate life sentence for second degree murder." (*Ibid*.)

This case has more in common with *Oganesyan* than *Brasure*. Unlike *Brasure*, Triplett's determinate sentence was stayed under section 654. "'A stay is a temporary suspension of a procedure in a case until the happening of a defined contingency.'" (*People v. Carrillo* (2001) 87 Cal.App.4th 1416, 1421.) Because Triplett's determinate sentence is suspended, his current sentence does not presently allow for parole and there is no evidence or reason to believe the stay will ever be lifted. Thus, like *Oganesyan*, no parole revocation fine should have been imposed.

## DISPOSITION

The judgment shall be modified to strike the parole revocation fine imposed under section 1202.45. It is affirmed in all other respects.

MOORE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

DELANEY, J.

19