Filed 5/4/26; Certified for Publication 5/28/26 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DONTE JEROME HADDOCK,<br><br>    Defendant and Appellant. | D084537<br><br><br>(Super. Ct. No. SCD267959) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY CONSTANTIN FRANK,<br><br>    Defendant and Appellant. | D084538<br><br><br>(Super. Ct. No. SCD267959) |

CONSOLIDATED APPEALS[1] from orders of the Superior Court of San Diego County, Polly H. Shamoon, Judge.  Judgments conditionally reversed and remanded with instructions.

---

[1]    We previously granted Anthony Constantin Frank's unopposed motion to consolidate appeal numbers D084537 and D084538 under appeal number D084537.

Shay Dinata-Hanson, under appointment by the Court of Appeal, for Defendant and Appellant Donte Jerome Haddock.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Constantin Frank.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Marvin E. Mizell, Christine Y. Friedman and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

In two separate incidents, fellow gang members Anthony Constantin Frank and Donte Jerome Haddock (together appellants), were charged with shooting to death Darris W. in 2011 and Xusha B. in 2013. A jury found appellants guilty of two counts of murder (Pen. Code, § 187), two counts of conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1)), and attempting to murder Malcolm H. (Pen. Code, §§ 664/187, subd (a), 189). The jury also found true gang enhancement allegations attached to each count (Pen. Code, § 186.22, subd. (b)(1) & (5)), gang-related firearm enhancements (Pen. Code, § 12022.53, subds. (d) & (e)(1)), and a lying in wait special circumstance enhancement for both murders (Pen. Code, § 190.2, subd. (a)(15)). As to the second murder count, the jury also found true allegations that multiple murders occurred (Pen. Code, § 190.2, subd. (a)(3)) and that a firearm was discharged from a vehicle (Pen. Code, § 190.2, subd. (a)(21)). The court sentenced appellants to a total prison sentence of two consecutive life terms without the possibility of parole, plus 82 years to life for Haddock and 90 years to life for Frank.

In August 2022, we vacated the gang enhancement allegations and the gang-related firearm enhancement. (*People v. Frank* (Aug. 5, 2022, D076986,

2

D076737) [nonpub. opn.] (*Frank I*).)[2]  On remand, the People elected not to retry the gang enhancements and appellants filed motions for new trial under the Racial Justice Act (RJA), Penal Code section 745, subdivision (a)(1) and (2), and newly enacted Evidence Code[3] section 352.2. Haddock filed a motion for discovery under the RJA which Frank joined. After the trial court denied the motions, Haddock renewed his new trial motion, which Frank joined.  Following a hearing, the court denied the renewed motion for a new trial.  The court sentenced appellants to two terms of life without parole, plus seven years to life.

Appellants contend the trial court erred by denying their:  (1) new trial motions under section 352.2; (2) renewed new trial motions under the RJA; and (3) request for RJA discovery.  We reject their first argument but conclude the trial court applied improper legal standards in denying their renewed new trial motions and requests for RJA discovery.  We conditionally reverse the judgments and remand for further proceedings consistent with this opinion.

FACTUAL BACKGROUND[4]

The San Diego Lincoln Park Bloods (LPB) and the Skyline Piru Bloods (Skyline) are rival criminal street gangs with a history of back-and-forth shootings.  Appellants were LPB gang members, although Frank had initially been a part of another gang called the 5-9 Brims, a gang aligned with LPB. Glenn G. and Donny L. were LPB gang members.  Gang monikers follow a

---

[2]    Frank's unopposed request to take judicial notice of *Frank I* is granted.

[3]    Undesignated statutory references are to the Evidence Code.

[4]    In *Frank I*, we provided the factual details regarding the murders.  We provide only an outline here and refer readers to our factual summary in *Frank I.  (Frank I, supra,* D076986, D076737.)

3

generational hierarchy and lower named individuals, such as Frank, commit crimes for the gang to receive status within the gang and the respect of older gang members, such as Glenn and Donny.

On the night of April 29, 2011, some high school girls rented a party bus that picked people up near a restaurant. Some of the girls had invited Frank and Haddock. Some uninvited Skyline gang members appeared, including Darris. The police later stopped the bus and several people got off and arranged alternative transportation back to the restaurant where the bus had picked them up. At the restaurant, Darris and a friend went to the friend's car. Gunfire erupted. Darris, who had been sitting in the backseat of the car, had been shot. Darris suffered three gunshot wounds and bled to death from his injuries. Another person noticed "5-0" or "5-9" had been written in dust or condensation on the car window, which meant to him that the LPB gang was involved in the shooting. Cell phone location data showed that Frank was in communication with Haddock and that Haddock was in communication with Glenn.

Frank obtained a nine-millimeter handgun from another LPB gang member. On the night of May 4, 2013, appellants drove to a party in Haddock's Impala. After the party, there was talk about the fact Skyline gang members were down the street at a hookah lounge. An unidentified person from the LPB gang was also at the hookah lounge. From the hookah lounge, someone suggested going to a casino in several cars. Xusha was in the passenger seat of one of the cars. Haddock saw the cars leaving and positioned his car behind the caravan of vehicles. At the time, Haddock was driving his Impala with Frank and another person as his passengers. At one point, Frank told his friend to "[g]et down" and began shooting at the car Xusha was in. Xusha was shot in the head and died from the injury. A

4

jailhouse informant testified that while in a holding tank, Frank described how he shot at another car on a freeway.

DISCUSSION

I.

THE NEW TRIAL MOTIONS WERE PROPERLY DENIED

A. *Additional Background*

### The Trial and Appellate Opinion

Before trial, the prosecutor notified the court that she intended to introduce a rap song performed by Glenn, also known as "Little Fatal," an unnamed coconspirator in Darris's 2011 murder. The song was published on August 17, 2011, approximately three months after Darris's murder, by Glenn with whom Frank had a social media conversation six hours before Darris's murder. The prosecutor planned to introduce a portion of the rap song sung by Glenn as evidence of Glenn's personal animus toward Skyline, his gang membership and motive for the 2011 killing. The portion of the rap song that the prosecutor sought to introduce contained the following lyrics:

> "Eastside what? Eastside of the map where the niggas try to say fuck Lincoln Park in they raps, but we aint trippin cuz, we really know the facts. Where the niggas hang out in broad daylight and get klacked.[5] Try to come through ma hood and get messed-up with the gat, sent to the mortuary with a bullet in ya brain. I'm Lil Fatal,[6] I'm in it for the stats not the fame. Run up smoked ya big homeboy for the cocaine and went back to the dip where we hold them fat straps, Desert Eagles drop the triangle in ya face like that. Aint no love foo, so why ya fuckin with us? Come thru and get touched nigga, it's a must. I get the LP up and then I skate to the block I'm in a D.I.P. where

---

5    "Klacked" means killed.

6    "Lil Fatal" refers to Glenn.

5

Crosstowns[7] get shot.  You might go to the Lola, go through and klack, but I guarantee you come through the DIP you won't make it back.  Slip Slide D-I standing over a body screaming fuck skyline be a goddam shame how these dudes flat line and these niggas still talkin but its L's on mine." (*Frank I, supra*, D076986, D076737.)

Appellants objected, arguing that the song had an attenuated connection to them, was inflammatory, irrelevant, and cumulative of other evidence.  The prosecutor acknowledged that the song's lyrics did not pertain to Darris's 2011 murder but argued it was significant that the song was published online in 2011.  The operative complaint alleged that a conspiracy existed between appellants to murder Darris for the benefit of LPB.  The prosecutor argued she had an obligation to prove that Glenn and Donny— alleged uncharged coconspirators in the conspiracy to kill Darris—were LPB gang members, that two witnesses had claimed they were not gang members, and that the animus of the uncharged coconspirators toward Skyline was relevant to the case.  She also argued that the prosecution needed to establish the origin of the conspiracy.  Among other things, Haddock's defense counsel objected to the song being played because gunshots could be heard.

After the trial court ruled that the song could be introduced because it was highly probative regarding the motive of a coconspirator and not unduly prejudicial under section 352, appellants offered to stipulate that Glenn was a LPB gang member to eliminate the need to introduce the song.  The trial court impliedly rejected this proposal.  It found the rap song highly probative because it contained Glenn's own first-person statements bearing on motive, allowing the jury to hear him directly.  The court also concluded the evidence

---

7    "Crosstowns" refer to any member of a rival gang.

6

was relevant to appellants' motives in complying with Glenn's wishes. Considering the extensive gang-related animus already at issue in the trial, the court determined the rap song was not unduly prejudicial under section 352.

The prosecutor informed the court that she was not planning to play the entire song, just what was written in exhibit 23. She informed the court that she had "clipped" the song to eliminate its introduction which included gunshots and sirens and offered to play it for the court. The clipped portion of the song which she planned on playing was transcribed in exhibit 23. She believed the introduction was prejudicial and involved individuals not related to the case. The court found the rap song, as described by the prosecutor, admissible. As such, the trial court never expressly ruled on the admissibility of the rap song's introduction.

The prosecutor introduced the rap song during the testimony of its gang expert. The gang expert first reviewed some social media communications between Frank and Glenn dated April 28, 2011, the day before Darris's murder, and referred to a conversation that Frank had with Donny. The gang expert discussed the rap song, the prosecutor played exhibit 22 for the jury, without objection, and presented a transcript of the audio (exhibit 23) to the jury. The gang expert then opined that Glenn was an LPB gang member at the time of Darris's murder. During cross-examination, the gang expert stated no evidence existed showing that Haddock was involved in promoting or producing the rap song. The gang expert also stated that rappers may rap about conduct in which they do not actually participate and that a "studio gangster" may rap about incidents to which he has no connection.

### The Appellate Opinion

In *Frank I, supra*, D076986, D076737, we explained the prosecution's theory that Glenn and Donny—respected gang members—acted as unnamed coconspirators who directed Frank to commit the murder and recruit others, such as Haddock, to assist him. The prosecutor argued that Glenn was someone who appellants looked up to and followed, and that the song reflected Glenn's personal desire and intent. The People presented evidence that Glenn and Donny were LPB gang members. Glenn's gang moniker was Lil Fatal, Donny's was Baby Fatal, and Frank's was Tiny Fatal. The gang expert explained the generational hierarchy of gang monikers, noting the original name "Fatal" is followed by Lil Fatal, Baby Fatal, and Tiny Fatal. Lower-ranked members, such as Frank (Tiny Fatal), commit crimes to gain status and the respect of more senior gang members, such as Donny and Glenn. Additional evidence established that Frank identified Glenn as Lil Fatal. The song's lyrics identified the singer as Lil Fatal, meaning Glenn.

We concluded the song was relevant to establishing Glenn's motivation for the murder (his personal animus toward Skyline), and that the gang expert's testimony established Frank's motive to comply with Glenn's wishes. We further noted that appellants failed to explain how this evidence of motive and intent was cumulative to other evidence in the case. We rejected appellants' argument that trial court erred under section 352 by admitting the song as unduly prejudicial or as likely to trigger racial bias.

We noted the gang expert's testimony that Haddock was not involved with the song and rappers often do not carry out the conduct that they sing about. The lyrics did not mention appellants and addressed shooting and killing Skyline members in generic terms. We also noted that introduction of the lyrics and audio clip likely took less than 10 minutes in an otherwise

lengthy trial covering over 6,000 pages of reporter's transcript, was limited to Glenn's portion and did not include other sounds such as sirens and gunshots.

***The New Trial Motions***

Appellants' new trial motions asserted that section 352.2 applies retroactively and the rap song should have been excluded. After hearing argument, the trial court denied the motions under section 352.2. Assuming this section even applied, the trial court found the rap song admissible under the new standard. It considered the potential of injecting racial bias and improper section 1101 character inferences but found the song's strong probative value was not substantially outweighed by its potential prejudicial impact. Relying on our statements in *Frank I*, it stated that even if the song should have been excluded, appellants have not shown a miscarriage of justice warranting a new trial. (*Frank I, supra*, D076986, D076737.)

Based on "new evidence" that the introduction to the rap song had been played in front of the jury, Haddock renewed his new trial motion, which Frank joined. The trial court denied the motion, stating it did not believe Haddock's uncorroborated claim that the jury heard the rap song introduction.

B. *Analysis*

Effective January 1, 2023, section 352.2 requires a specific inquiry when assessing the admissibility of a creative expression under section 352. (*People v. Aguirre* (2025) 18 Cal.5th 629, 687 (*Aguirre*).) In addition to the factors in section 352, a trial court must also consider that (1) the probative value of such expression as a literal or truthful narrative is minimal unless it was created close in time to the charged crime and closely resembles the charged crime, or contains factual details not otherwise publicly known; and

(2) undue prejudice includes the risk that the trier of fact will treat the expression, contrary to section 1101, as evidence of the defendant's violent propensity or criminal disposition, or that it will explicitly or implicitly introduce racial bias into the proceedings. (§ 352.2, subd. (a).)

When determining the admissibility of a creative expression, a trial court must consider specified evidence if offered and relevant, in addition to any other relevant evidence. (§ 352.2, subd. (b).) The statute defines a "creative expression" as the use of creativity or imagination to produce or arrange forms, sounds, words, movements, or symbols, including music, dance, performance art, visual art, poetry, literature, film, and similar media. (§ 352.2, subd. (c).)

Appellants initially argued that section 352.2 applies retroactively and the trial court erred when it failed to exclude the rap song. As the People correctly observe, the Supreme Court has since held that section 352.2 does not apply retroactively. (*Aguirre, supra*, 18 Cal.5th at pp. 683, 687–693.) The People therefore contend our prior determination in *Frank I* regarding the admissibility of the rap song constitutes law of the case. (*Frank I, supra*, D076986, D076737.)

Appellants now concede that section 352.2 does not apply retroactively. They nevertheless argue that the law of the case doctrine should not apply because *Aguirre, supra*, 18 Cal.5th 629 clarified the proper section 352 analysis where creative expressions are at issue, and, under that clarified framework, admission of the rap song here was unduly prejudicial. They further suggest "new evidence" presented below alters the factual landscape, though they do not clearly identify this evidence. Construing their argument, we understand the purported new evidence to be Haddock's testimony that the jury heard the rap song's excluded introduction.

10

Under the law-of-the-case doctrine, a rule or principle articulated by a reviewing court that is necessary to its decision is binding in all subsequent proceedings in the same case. (*People v. Jurado* (2006) 38 Cal.4th 72, 94.) The doctrine bars relitigation of issues already decided on appeal absent a material change in circumstances (*People v. Sons* (2008) 164 Cal.App.4th 90, 99), and it obligates courts to adhere to prior appellate rulings even if those rulings may be erroneous (*id.* at p. 98). Although discretionary, departure from the doctrine is reserved for exceptional circumstances, such as an intervening change in controlling law or a manifest injustice. (*People v. Stanley* (1995) 10 Cal.4th 764, 787.)

Here, neither circumstance is present. *Aguirre,* did not alter the governing legal standard under section 352; rather, it synthesized and discussed factors courts have long considered when evaluating the admissibility of creative expressions. (*Aguirre, supra*, 18 Cal.5th at pp. 693–696.) Accordingly, we reject appellants' contention that *Aguirre* effected a material change in the law sufficient to displace the law-of-the-case doctrine.

Even if we were to revisit the issue, application of the considerations discussed in *Aguirre* confirms the correctness of the trial court's ruling. Evidence presented at trial informed jurors that the song likely existed years before the murders and Glenn was the singer. The prosecution did not offer the rap lyrics as a literal account of the charged crimes, nor did it argue they should be taken as such. Instead, the evidence was introduced for the limited and permissible purpose of establishing Glenn's animus toward Skyline and, through the gang expert's testimony, explaining appellants' motive to act in accordance with his directives. This use substantially reduces the risk that the jury would treat the lyrics as evidence of appellants' propensity for

violence. As we noted in *Frank I*, appellants never explained how this motive and intent evidence was cumulative to other evidence in the case. (*Frank I, supra*, D076986, D076737.)

Nor does the record support a finding of undue prejudice. The lyrics did not reference appellants or the charged crimes, and the presentation was brief in the context of a lengthy trial. The trial court further mitigated any potential prejudice by instructing the jury on the limited use of gang evidence (CALCRIM No. 1403), an instruction we presume the jury followed.[8] (*People v. Washington* (2017) 15 Cal.App.5th 19, 26.)

During closing argument, Haddock's defense counsel cautioned jurors not to infer from the rap song that appellants were murderers. The prosecutor followed this theme during rebuttal, stating: "If you believe that I am asking you to find these men guilty of two murders because of a rap song, please acquit them." The prosecutor then explained the song's purpose was "to establish that the two men who ordered the 2011 killing were members of the gang. And that they had a motive." But the song "by itself [did not] create guilt" but was "a piece of relevant evidence" they could consider.

---

[8]     CALCRIM No. 1403 provides: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and allegations charged; [¶] OR [¶] The defendant had a motive to commit the crimes charged; [¶] OR [¶] The defendant was engaged in a conspiracy; [¶] OR [¶] To show identification of the perpetrator and aider and abettors, relationship between the defendants, victims and witnesses, and to prove malice. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

12

In sum, appellants identify no intervening change in law or material factual development that would justify departure from the law-of-the-case doctrine. *Aguirre* did not redefine the governing standard, and the trial court's admission of the rap evidence—both under the law in effect at the time of trial and under the analytical framework later discussed in *Aguirre*—fell well within its discretion. The evidence was introduced for a legitimate, nonpropensity purpose, was narrowly presented, and was accompanied by appropriate limiting instructions and argument. On this record, appellants have not established error, much less a miscarriage of justice warranting reversal.

## II.

## APPELLANTS ESTABLISHED A PRIMA FACIE RJA VIOLATION

A. *Additional Background*

In their renewed new trial motions, appellants alleged that admitting the rap song and the song's introduction (the introduction) violated the RJA. The motion included a transcript of a spoken word introduction:

> "[Glenn]: 'Aye, what's up nigga?'
>
> "[Other Man]: 'What's happening, Blood?'
>
> "[Glenn]: 'Remember that li'l bitch I was putting you up on, the one over there in the crosstown?'
>
> "[Other Man]: 'Yeah.'
>
> "[Glenn]: 'She said the niggas is out in front of her house and, shit, let's handle up.
>
> "[Other Man]: 'Oh, for sure nigga–I got the 9 on me right now. What's bracking?'
>
> "[Glenn]: 'You know I keep the gauge in the motherfucking trunk nigga.'
>
> "(car starts[; ] car squeals tires and drives off loudly.)

13

> "[Glenn]: 'That's the house right there. Right there. Aye, what's up nigga. What that Lincoln Park murder gang like?
>
> "(approximately 14 shots fired . . . windows breaking[, ] police sirens)"

At trial, the prosecutor recognized the prejudicial nature of the introduction, stating it would not be played for the jury. Haddock testified that although the trial court had ruled the introduction would be excluded, he insisted that it had been played for the jury and described that portion of the song as being "movie theater loud." He claimed that he asked his defense counsel to object but she remained silent for fear of highlighting it to the jury. He conceded that no jurors complained about hearing additional material that did not appear on the transcripts, and his attorney never objected to that material.[9] Efforts were made at the trial and appellate court to locate the audio portion played to the jury but it could not be located.

Frank's defense counsel recalled hearing the "extended version" played in court at some point, but added, "I can't say what all was played for the jury." After reminding counsel that the renewed new trial motion was limited to whether the jury heard the introduction, the trial court denied the motion, stating it did not believe Haddock's uncorroborated claim that the jury heard the introduction. Even assuming the jury heard the introduction, the court found the verdicts would not have changed and no miscarriage of justice occurred.

B. *Analysis*

When initially enacted, the RJA applied "only prospectively in cases in which judgment ha[d] not been entered prior to January 1, 2021." (Former Pen. Code, § 745, subd. (j).) In enacting Penal Code section 745, the

---

9     The original trial judge had since retired.

14

Legislature sought to eliminate racial bias from California's criminal justice system, declaring that racism—whether intentional or implicit—at any stage of a criminal case undermines fairness and constitutes a miscarriage of justice under the state Constitution. (Stats. 2020, ch. 317, (Assem. Bill 2542), § 2, subd. (i), eff. Jan. 1, 2021.) The statute is designed not to punish bias but to remedy its impact on defendants and the judicial process, ensuring that race plays no role in obtaining convictions or imposing sentences and rejecting the premise that racial disparities in the system are unavoidable. (*Ibid.*) The following year, the Legislature amended subdivision (j) to provide the RJA applies to all cases where the judgment is not final. (Pen. Code, § 745, subd. (j)(1); Stats. 2022, ch. 739 (Assem. Bill 256), § 2, eff. Jan. 1, 2023.)

The RJA identifies four categories of conduct, any one of which, if proved, is sufficient to establish a violation of Penal Code section 745, subdivision (a). (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147 (*Young*).) In their renewed motion, appellants relied on section 745, subdivision (a)(1) and (2), which permit a defendant to establish a RJA violation by a preponderance of the evidence where:

> "(1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin.

> "(2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful. This paragraph does not apply if the person speaking is relating language used by another that

15

is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (Pen. Code, § 745, subd. (a)(1) & (2).)

Penal Code section 745 defines "racially discriminatory language" as "[l]anguage that, to an objective observer, explicitly or implicitly appeals to racial bias," "or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (Pen. Code, § 745, subd. (h)(4).) "Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (*Ibid*.) However, Penal Code section 745, subdivision (a)(2) specifically provides that it "does not apply if the person speaking is relating language used by another that is *relevant* to the case." (Italics added.)

A defendant alleging an RJA violation must first make a prima facie showing in the trial court—i.e., present facts that, if true, demonstrate a substantial likelihood of a violation. (Pen. Code, § 745, subds. (c) & (h)(2).) This standard falls between a mere possibility and a preponderance of the evidence. (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 22 (*Finley*).) At this stage, the court must accept the defendant's factual allegations as true, including expert and statistical evidence, unless they are conclusory, unsupported, or contradicted by the record. (*Id.* at p. 23.) Critically, the trial court may not weigh competing evidence or make credibility determinations, except in the rare circumstances where the record " 'irrefutably establishes' " the allegations are false. (*Id.* at p. 24.)

If the trial court determines a defendant has made a prima facie showing, it must conduct an evidentiary hearing where it may consider evidence and arguments submitted by the People, make credibility determinations, and weigh the evidence. (Pen. Code, § 745, subd. (c)(1); see

16

*Finley, supra*, 95 Cal.App.5th at p. 25.) At the conclusion of the hearing, the court must make findings on the record. (Pen. Code, § 745, subd. (c)(4).) We review de novo the trial court's legal conclusion that appellants failed to make a prima facie showing. (*People v. Howard* (2024) 104 Cal.App.5th 625, 650 (*Howard*).)

Appellants contend that admission of the rap song—and, critically, its introduction—injected racial bias into the proceedings, and that the trial court failed to account for this risk notwithstanding any relevance of the song itself. They further argue the court exceeded the limited scope of prima facie review by rejecting Haddock's testimony that the jurors heard the introduction. Accordingly, they contend the court erred in concluding they failed to satisfy their prima facie burden. We agree.

Haddock testified that in addition to the song being played, the jury also heard a 20 to 30 second spoken word introduction to the song—all movie-theater-loud—which included individuals discussing a gun and planning to shoot someone, driving to the person's location, guns being cocked, and then the sounds of 14 gunshots, shattering glass, screeching tires, and police sirens. Although the precise audio portion played for the jury could not be located in either the trial or appellate courts, nothing in the record affirmatively refutes Haddock's account.

Penal Code section 745, subdivision (a)(2) encompasses the use of "racially discriminatory language" by an attorney, as well as conduct that "otherwise exhibited bias or animus towards the defendant . . . ." The Legislative intent behind the RJA's enactment states it was aimed at addressing "the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials." (Stats. 2020, ch. 317, § 2, subd. (e).) More recently, the Legislature has reaffirmed that the RJA must be

17

construed in light of the need for "bold, concerted, and ongoing efforts" to remedy "centuries of historical and embedded racial injustice . . . ." (Stats. 2025, ch. 721, § 1, subd. (f).) Consistent with that mandate, appellants argue the statute applies where the prosecution offers racially incendiary material, even if the prosecutor did not author or personally utter the language. That position accords with the statute's text and purpose. A prosecutor may exhibit "bias or animus" within the meaning of the RJA by presenting "racially incendiary or racially coded language" to the jury. Here, the prosecutor's presentation of the introduction—replete with racially charged language and violent imagery—extends beyond the statute's narrow exception for merely relating otherwise *relevant* third-party statements. Indeed, the prosecutor effectively conceded the point by stating the introduction should be excluded.

Despite this, the trial court concluded that appellants failed to make a prima facie showing. The court did not find Haddock's testimony conclusory, irrelevant, or unsupported; rather, it discounted the testimony as uncorroborated and not credible. This was error. At the prima facie stage, appellants were not required to prove the truth of Haddock's account; they were required only to show that, if true, the facts alleged would establish a violation. The court further erred by proceeding with a prejudice analysis— reasoning that, even if the jury heard the introduction, the verdicts would not have changed and no miscarriage of justice occurred. But prejudice is not part of the prima facie inquiry. The question is solely whether appellants "satisfied [their] initial minimal burden to produce facts that, if true, establish that there is more than a mere possibility of an RJA violation." (*Howard, supra*, 104 Cal.App.5th at p. 656.) Whether any ultimately proven

18

violation was prejudicial is a question for a later stage in the proceedings. (See Pen. Code, § 745, subd. (k).)

Applying de novo review, we conclude appellants met their minimal burden to allege facts that, if true, establish more than a mere possibility of an RJA violation. (*Howard, supra*, 104 Cal.App.5th at p. 656.) Accordingly, we conditionally reverse the judgments and remand this matter with directions to conduct an evidentiary hearing on appellants' RJA motions. (*Ibid.*) On remand, the trial court shall evaluate the claim under Penal Code section 745, subdivision (c), at which appellants will bear the burden of proving a violation by a preponderance of the evidence. (*Id.*, subd. (c)(2).) We express no view on the ultimate merits of appellants' RJA claims.

III.

## THE TRIAL COURT IMPROPERLY DENIED APPELLANTS' MOTION FOR RJA DISCOVERY

A. *Additional Background*

Appellants sought RJA discovery alleging the multiple murder, lying in wait and discharging a firearm from a vehicle special circumstance enhancements attached to the homicide charges more likely than not violated Penal Code section 745, subdivision (a)(3). (Pen. Code, § 190.2, subd. (a)(3), (15) & (21).) They claimed that publicly available data shows the number of California state prison inmates with special circumstance enhancements are disproportionately Black or Latino compared to White inmates. To support this claim, they presented a preliminary analysis of homicide data generated by the San Diego District Attorney's Office showing that homicide filings between 2002 and 2019, 2263 homicide filings, reflected a disproportionate rate at which Black individuals were charged with special circumstances compared to White individuals. Specifically, the ratio of Black

19

individuals charged with special circumstances and total homicide cases charging Black individuals came out to be 1.36. By comparison, this same ratio for White individuals was 0.80. The analysis concluded that "[t]he comparison clearly indicates presence of a bias." Appellants argued that this data provides good cause to order the District Attorney to disclose the following information for the last five years:

> "a. A list of all defendants who the District Attorney charged with homicide, which identifies for each individual: the date of the charge, the specific degree of the charge, whether the individual was charged with a special circumstance offense, and the individual's race and ethnicity;

> "b. Any and all criteria relied upon by the San Diego District Attorney's office in deciding whether or not to pursue special circumstances in each case identified in . . . [10] item (a) above;

> "c. Copies of the arrest record for the homicide arrest for each identified individual in response to [item (a) above];

> "d. Copies of all indictments, complaints, or other types of pleadings for all individuals identified in [item (a) above];

> "e. Copies of all emails, records or investigative reports filed, pending, completed, or otherwise made regarding any charging of special circumstance offenses in San Diego County."

In December 2023, the trial court denied appellants' request for RJA discovery. Relying on *Young, supra*, 79 Cal.App.5th 138 to analyze the good cause requirement under subdivision (d) of Penal Code section 745, the court noted that the defendant in *Young* provided statistical evidence regarding racial profiling and "described factual circumstances [that] bore the hallmark

---

10     Items (b), (c), and (d) refer to "Request No. 2," but the motion does not contain such a request.

of racial profiling." It contrasted those facts with the present case, finding defendants had failed to support their claim of discriminatory charging of special circumstances with case-specific facts suggesting bias. The court further remarked that, because appellants were charged with multiple murders, "it was almost a given that they would be charged with special circumstances."

It found the San Diego County statistics relevant but concluded that "[a four] percent difference across all homicide filings in San Diego County for nearly 20 years does not in and of itself provide a plausible justification for the violation of [the] RJA, especially because in this case, unlike *Young*, no case-specific facts toward racial discrimination are cited." As an additional basis for denial, the court found appellants had failed to satisfy several discovery-related factors set forth in *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118 (*Alhambra*).

B. *RJA Discovery*

If a defendant believes that a violation of the RJA has occurred, they "may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state." (Pen. Code, § 745, subd. (d).) "Upon a showing of good cause, the court shall order the records to be released." (*Ibid.*) The RJA does not define the term "good cause." (Pen. Code, § 745, subd. (d); see also *id.* subd. (h).) In *Young, supra*, 79 Cal.App.5th 138, the court held that a defendant establishes good cause for RJA discovery by presenting "specific facts" providing a "plausible" factual basis that a violation " 'could or might have occurred.' " (*Id.* at p. 159.) The court emphasized that the governing limitation is discovery relevance—the request must be reasonably calculated

21

to lead to admissible evidence probative of a violation of Penal Code section 745, subdivision (a).  (*Young,* at p. 160.)

Later courts have reiterated that the showing required to establish a plausible factual foundation for discovery under the RJA is minimal.  In *Gonzales v. Superior Court* (2024) 108 Cal.App.5th Supp. 36 (*Gonzales*), the court explained that at the request for discovery stage a court need not determine whether a violation under Penal Code section 745, subdivision (a) may ultimately be established or ruled out.  (*Gonzales,* at p. 55.)  The dispositive question is whether a defendant demonstrated a plausible factual foundation for any potential RJA violation sufficient to show good cause.  (*Id.* at p. 56.)  The *Gonzales* court rejected the argument that "case-specific facts are required to establish the showing for discovery of any kind of RJA violation" and concluded that the "county-level data and statistics" offered by defendant was "sufficient to meet the specificity requirement for a plausible factual foundation."  (*Id.* at p. 65.)  The court reasoned that a defendant cannot make a more specific showing of an RJA violation without the discovery sought from the People, and demanding such proof at this stage would be "circular."  (*Id.* at p. 66.)  Rather, statistical evidence suggesting that a protected class may have been disproportionately charged with a particular crime, while similarly situated individuals not in that class were not charged, is sufficient to establish that an RJA violation could or might have occurred.  (*Ibid.*)

The court in *McDaniel v. Superior Court* (2025) 111 Cal.App.5th 228, 244 (*McDaniel*), agreed with the reasoning in *Young, supra*, 79 Cal.App.5th 138 and *Gonzales, supra*, 108 Cal.App.5th Supp. 36 that a defendant seeking RJA discovery "only need to show plausibility based on " 'specific facts.' " (*McDaniel,* at p. 244.)  The required showing may rest on case-specific facts,

22

as in *Young*, or on statistical evidence related to the charges and individuals involved, as in *Gonzales*, or on a combination of both. (*McDaniel,* at p. 244.) The court noted that neither the RJA nor *Young* mandates any particular type of "specific facts," and courts should instead evaluate whether the proffered facts are relevant to allegations of racial bias and establish a minimally plausible basis "to grant discovery—a low threshold." (*McDaniel,* at p. 244.)[11]

If a defendant makes a threshold plausible justification showing to grant discovery, the trial court must then consider and balance the seven factors listed in *Alhambra, supra*, 205 Cal.App.3d 1118. (*Young, supra*, 79 Cal.App.5th at p. 144.) Those factors are: (1) whether the requested material is adequately described; (2) reasonably available to the government and not readily obtainable by the defendant elsewhere; (3) whether production would violate third-party privacy or protected governmental interests; (4) whether the request is timely; (5) whether production would unreasonably delay trial; (6) whether it would impose an unreasonable burden on the government; and (7) whether the defendant has shown a sufficiently plausible justification for the information sought. (*Alhambra, supra*, 205 Cal.App.3d at p. 1134.)

---

11   In October 2025, the Governor signed into law two bills that amended Penal Code section 745 and other provisions of the RJA, effective January 1, 2026: Senate Bill No. 734 (2025–2026 Reg. Sess.) and Assembly Bill No. 1071 (2025–2026 Reg. Sess.). Uncodified legislative findings state the Legislature "intend[ed] that individuals must be afforded access to a broad range of relevant discovery to develop and support their *potential* RJA claims. Otherwise, they are left in the impossible position of having their claims rejected for want of the very data they seek. This is antithetical to the RJA." (Assem. Bill No. 1071, § 1(b), italics added.) Consistent with the Legislature's stated intent, trial courts have the authority to grant a defendant's claim for discovery under the RJA even if a defendant does not make a prima facie showing for relief in a new trial motion.

We review the trial court's discovery order for abuse of discretion, " 'because management of discovery lies within the sound discretion of the trial court.' " (*Young, supra*, 79 Cal.App.5th at p. 156.) "We review the factual underpinnings of a discretionary determination for substantial evidence [citation], but where such a determination rests on 'incorrect legal premises,' our review is de novo." (*Ibid.*) When an appellate court announces a new standard, the proper course is to remand to the trial court for application of the correct standard to the facts of the case. (*Id.* at p. 169.)

C. *Analysis*

The trial court's denial of appellants' motion for RJA discovery rested on two legally erroneous premises, that appellants were required (1) to provide case-specific facts in addition to countywide facts and (2) satisfy the *Alhambra, supra*, 205 Cal.App.3d 1118 factors to establish a plausible factual foundation for a RJA violation.

First, the trial court placed substantial weight on appellants' failure to present case-specific facts such as those presented in *Young*—a pretextual traffic stop, excessive or unprovoked force, or an unjustified vehicle search. (*Young, supra*, 79 Cal.App.5th at p. 146.) But subsequent authority has clarified that such a requirement is too restrictive. Both the *Gonzales* and *McDaniel* decisions, decided after the trial court's ruling, make clear that a defendant may establish a plausible factual foundation for a RJA discovery through statistical evidence alone. (*McDaniel, supra*, 111 Cal.App.5th at p. 242; *Gonzales, supra*, 108 Cal.App.5th Supp. at pp. 62–63, 65.)

Here, appellants presented county-level data showing that Black individuals were charged with special circumstances at a disproportionately higher rate (1.36) than White individuals (0.80), a disparity the analysis concluded "clearly indicate[d]" bias. Under *McDaniel*, such disparities "may

provide a plausible basis for asserting that an RJA violation 'could or might have' occurred." (*McDaniel, supra*, 111 Cal.App.5th at p. 243.)  By requiring additional case-specific facts, the trial court imposed a more demanding standard than the law permits.

Second, the trial court erred in relying on appellants' failure to satisfy the *Alhambra* factors as an independent ground for denying discovery.  The *Alhambra* factors come into play only after a defendant has made the threshold showing of good cause.  (*People v. Superior Court* (*Lalo*) (2025) 114 Cal.App.5th 707, 715.)  Thus, because the trial court concluded appellants had not established good cause, it had no occasion to weigh those factors, and its reliance on them at that stage was misplaced.

Moreover, as *Young* emphasizes, the *Alhambra* factors are intended to be applied flexibly.  (*Young, supra*, 79 Cal.App.5th at p. 168.)  Where a defendant has made a plausible showing that an RJA violation may have occurred, it will often constitute an abuse of discretion to categorically deny access to potentially relevant discovery.  (*Id.* at pp. 168–169.)  The trial court's approach—requiring both a heightened factual showing and satisfaction of the *Alhambra* factors at the threshold stage—effectively foreclosed discovery in a manner inconsistent with the RJA's purpose and governing case law.

The RJA was designed to facilitate the exposure and evaluation of potential racial bias, not to erect insurmountable barriers at the discovery stage.  By requiring more than a plausible factual showing and prematurely invoking additional discovery constraints, the trial court applied a framework that unduly restricted access to potentially probative evidence.  Because the trial court's ruling rested on erroneous legal premises, its denial of discovery constitutes an abuse of discretion.  The order denying discovery must

25

therefore be reversed, and the matter remanded for reconsideration consistent with governing authority. We express no view on whether discovery should ultimately be granted, nor do we preclude appellants from refining their request on remand.

## DISPOSITION

The judgments are conditionally reversed, and the matters are remanded for further proceedings on appellants' request for discovery and their motions under Penal Code section 745, consistent with this opinion. If the trial court denies relief on remand, the judgments will be reinstated. If the trial court grants relief on remand, the trial court shall conduct such further proceedings as necessary.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.

Filed 5/28/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DONTE JEROME HADDOCK,<br><br>    Defendant and Appellant. | D084537<br><br><br><br>(Super. Ct. No. SCD267959) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY CONSTANTIN FRANK,<br><br>    Defendant and Appellant. | D084538<br><br><br><br>(Super. Ct. No. SCD267959)<br><br>ORDER CERTIFYING<br>OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed May 4, 2026 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

MCCONNELL, P. J.

Copies to:  All parties

2